[L.A. No. 32062. Aug. 17, 1989.]

HAIDY McHUGH, Plaintiff and Respondent, v.
SANTA MONICA RENT CONTROL BOARD, Defendant and
Appellant;
LINDA L. SMITH et al., Real Parties in Interest and Respondents;
HELEN McCLELLAN et al., Interveners and Respondents.

**COUNSEL**

Joel Martin Levy, Jana Zimmer, Michael Heumann, Stephen P. Wiman and Marsha Jones Moutrie for Defendant and Appellant.

Marsha N. Cohen as Amicus Curiae on behalf of Defendant and Appellant.

Christopher M. Harding, Mark Garrett, Lawrence & Harding and Rhodes, Maloney Hart, Mullen, Jakle & Harding for Plaintiff and Respondent.

Thomas A. Seaton as Amicus Curiae on behalf of Plaintiff and Respondent.

No appearance for Real Parties in Interest and Respondents.

David M. Shell, Craig Mordoh, Thomas A. Nitti, Sherman L. Stacey and Stacey & Jones for Interveners and Respondents.

**OPINION**

**LUCAS, C. J.**—In this appeal we consider whether a provision of the Santa Monica Rent Control Charter Amendment (art. XVIII, Santa Monica City Charter, hereafter Charter Amendment) which provides for administrative adjudication of excess rent claims and imposition of treble damages (*id.*,

former[1] § 1809, subd. (b)) is unconstitutional because it permits the Santa Monica Rent Control Board (Board) to exercise judicial powers in violation of article VI, section 1 of the California Constitution.

We will conclude that administrative adjudication of excess rent claims under the Charter Amendment does not, in and of itself, violate the judicial powers clause. We will hold, however, that imposition of treble damages is a power beyond the Board's authority. We will also conclude that, on the facts of this case, the Board's order, which authorizes immediate rent withholding, violates the judicial powers clause.

## I. *Facts*

### A. *The Charter Amendment*

In April 1979 the voters of the City of Santa Monica adopted by initiative a rent control ordinance to be administered by the Board. The Charter Amendment gives the Board power to promulgate pertinent regulations, and to hear and determine complaints of violations of the system as administered. (§§ 1803, subd. (g), 1805, subd. (d); former § 1809, subd. (b).)

The Charter Amendment regulates the maximum allowable rents for controlled rental units and authorizes adjustments in maximum rents by way of both general (i.e., "across the board") and individual proceedings. (§§ 1804, 1805.) Under section 1810, any violation of the Charter Amendment by a landlord constitutes a misdemeanor punishable by a fine of not more than $500 or imprisonment for not more than six months in county jail, or both. Under section 1811, the Board, tenants or landlords of controlled units may seek a court order enjoining violations of the rent control law.

In addition, section 1809 of the Charter Amendment permits a court action for damages. (*Id.*, subds. (a) & (d).) At the time this case arose (see *post,* fn. 2), subdivision (a) of section 1809 provided: "Any landlord who demands, accepts, receives, or retains any payment of rent" in excess of the maximum allowed under the ordinance or the rules promulgated thereunder "shall be liable . . . to the tenant . . . for reasonable attorney's fees and costs as determined by the court, plus damages in the amount of five hundred dollars ($500) or three (3) times the amount by which the payment . . . received or retained exceeds the maximum lawful rent, whichever is the greater."

---

[1] The Charter Amendment provision at issue in this case has since been amended. (See *post,* fn. 2.) All future section references, unless otherwise indicated, are to the Charter Amendment.

Furthermore, former subdivision (b) of section 1809 established an alternative administrative remedy: "In lieu of filing a civil action as provided for in Section 1809 (a), the Board shall establish by rule and regulation a hearing procedure [to determine claimed violations of the regulatory system]. After said determination, the tenant may deduct the penalty from future rent payments in the manner provided by the Board." This latter subdivision, with its provision for administrative adjudication of "excess rents," is the focus of our inquiry.[2]

Section 1808 provides for review of the Board's decision. "A landlord or tenant aggrieved by any action or decision of the Board may seek judicial review by appealing to the appropriate court within the jurisdiction." The method of "appeal" utilized has been the filing of a petition for writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5.

B. *The Proceedings Below*

Two tenants, Smith and Plevka, filed an administrative complaint under the Charter Amendment, asserting plaintiff McHugh had charged them excess rent. After a hearing officer made initial determinations and orders, all parties appealed to the Board. The Board held the tenants had been overcharged, and awarded restitution of excess rent as well as treble damages. It expressly authorized Plevka (who remained in possession of the rental unit) to withhold $2,797.91, calculated as follows: $2,448 in treble damages ($816 for excess rent charged before the hearing examiner's findings, multiplied by three) plus $252 (excess rent charged after the hearing examiner's findings) plus $97.91 (interest on excess rents). The Board's order further stated, "The withheld amounts shall not form the basis for an unlawful detainer proceeding based upon non-payment of rent." (See § 1806, subd. (a).) The Board ruled that Smith (who had since vacated the rental unit) was entitled to total recovery of $1,593.08, calculated as follows: $1,411.50 in treble damages ($470.50 in excess rent charged before the hearing examiner's findings, multiplied by three) plus $130 (excess rent

---

[2] Pursuant to this subdivision, the Board has exercised authority to award treble damages.

In 1984 the Charter Amendment was revised. The new law retained the alternative court/administrative enforcement scheme and rent withholding remedy, but altered the provisions for monetary recovery in excess of the amount of overpaid rent. Under the revised version, treble damages are available only in a court action. (§ 1809, subds. (a), (b).) In an administrative action, a more limited "penalty" is available: "a landlord . . . may be liable for an additional amount not to exceed five hundred dollars ($500), for costs, expenses incurred in pursuing the hearing remedy, damages and penalties. The tenant shall bear the burden of showing entitlement to the penalty." (§ 1809, subd. (b)(2).) The subdivision further provides that if the tenant vacates the premises before completing withholding of the excess rent and penalties, the landlord "shall" pay the tenant "a sum equal to that which could have been withheld." (*Ibid.*)

charged after the hearing examiner's findings) plus $51.58 (interest on excess rents).

Plaintiff filed a petition for writ of mandate (Code Civ. Proc., § 1094.5) pursuant to section 1808. Subsequently, other landlords were permitted to file a complaint in intervention. Plaintiff's petition sought to compel the Board to set aside its decision on the ground that administrative adjudication of "excess rents" under former section 1809, subdivision (b), violates, inter alia, the judicial powers clause of the California Constitution. (Art. VI, § 1.) Plaintiff also sought to enjoin the Board from acting on any complaints for excess rent under the former subdivision. The intervening landlords sought not only similar declaratory and injunctive relief, but also a declaration that interveners had a constitutional right to jury trial in any "case" for damages or penalties.

After a hearing, the trial court granted plaintiff's and interveners' motions for summary judgment and entered judgment granting the petition for writ of mandate. It issued a peremptory writ ordering the Board to vacate the Plevka and Smith decisions, and declared former section 1809, subdivision (b), of the Charter Amendment "invalid because it requires the . . . Board to exercise judicial powers which fall within the ambit of Article VI, Section 1, of the California Constitution." The court issued a permanent injunction prohibiting the Board from proceeding on any pending or future complaint for excess rents under the former subdivision, and declared the Board's regulations invalid insofar as they implemented the former subdivision, but did not address interveners' jury trial claim. The Board appealed.

## II. *Analysis*

### A. *Background*

Article VI, section 1 of the California Constitution provides: "The judicial power of this State is vested in the Supreme Court, courts of appeal, superior courts, municipal courts, and justice courts. . . ." Despite the breadth of that statement, various administrative agencies in this state are authorized by the Constitution to exercise judicial powers. Some of these agencies are created by the Constitution, and are thereby vested with certain judicial powers (e.g., arts. XX, § 22 [Department of Alcoholic Beverage Control], XII [Public Utilities Commission]); others have been legislatively endowed with judicial powers pursuant to a specific constitutional authorization (see art. XIV, § 4 [Workers' Compensation Appeals Board]; *id.*, § 1 ["The Legislature may provide . . . for the general welfare of employees and for [that purpose] may confer on a commission legislative,

executive, and judicial powers."]).[3] The authority of such agencies to exercise judicial powers is not at issue here.

■ We have often noted that agencies not vested by the Constitution with judicial powers may not exercise such powers. "[A]rticle VI disposes of *all* judicial power not expressly disposed of elsewhere in the Constitution . . . . [A]lthough the Legislature retains the authority to grant a multitude of powers to local bodies pursuant to article XI, powers of a *judicial* nature are no longer at its disposal." (*Strumsky* v. *San Diego County Retirement Assn.* (1974) 11 Cal.3d 28, 42 [112 Cal.Rptr. 805, 520 P.2d 29], italics in original.)[4] ■ In this case we must determine whether the challenged Charter Amendment provision unconstitutionally authorizes the Board to exercise "judicial powers" within the meaning of article VI, section 1.

## B. *The Jersey Maid Decision*

Almost 50 years ago we held an ostensibly similar grant of power to an administrative agency unconstitutional under article VI, section 1. (*Jersey Maid Milk Products Co.* v. *Brock* (1939) 13 Cal.2d 620, 651-652 [91 P.2d 577]; see also *Pacific Coast Casualty Co.* v. *Pillsbury* (1915) 171 Cal. 319, 322 [153' P. 24] [commission that is authorized to finally settle liability disputes between employers and employees exercises judicial power] [dictum]; *Western Metal Supply Co.* v. *Pillsbury* (1916) 172 Cal. 407, 411-413 [156 P. 491] [same] [dictum].) Plaintiff asserts *Jersey Maid* controls this case, and requires that we affirm the trial court. As we explain below, however, we decline to apply *Jersey Maid*'s holding to the challenged remedial powers in this case.

*Jersey Maid* involved a broad constitutional challenge to the Milk Stabilization Act. In creating the act, the Legislature expressly declared that production and distribution of milk was "a business affected with a public interest." (13 Cal.2d at p. 626.) The declaration explained that milk was a necessary product and its availability vital to the public health and welfare. Because of "unfair, unjust, destructive and demoralizing trade practices" that constituted a "constant menace" to California's citizens and degraded

---

[3] Plaintiff suggests, for example, that the Agricultural Labor Relations Board (Lab. Code, § 1140 et seq.) is in this latter group of agencies.

[4] See Civil Code section 1947.7. In that statute, effective January 1, 1987, the Legislature provides that as to landlords who are in "substantial compliance" with a rent control law, the "exclusive remedies" for noncompliance shall be restitution to the tenant, with recovery of filing fees due to the "local agency." (*Id.*, subd. (b).) The statute further provides: "Nothing in this section shall be construed to grant to any public entity any power which it does not possess independent of this section to control or establish a system of control on the price at which accommodations may be offered for rent or lease, or to diminish any such power which *that public entity* may possess, except as specifically provided in this section."

the quality of available milk, and because health regulations alone could not cure the problem, the Legislature explained, "it is the policy of this State to promote, foster and encourage the intelligent production and orderly marketing of commodities necessary to its citizens . . . and to eliminate speculation, waste, improper marketing, unfair and destructive trade practices, and improper accounting for milk purchased from producers." (13 Cal.2d at pp. 626-627.) To this end, the Legislature enacted a detailed plan that, inter alia, allowed the Director of Agriculture to establish minimum prices for milk in order to promote quality in the industry and protect the public.

This court upheld most of the act's provisions against various due process and equal protection challenges. (13 Cal.2d at pp. 636-651, 652-660.) We specifically rejected numerous attacks grounded on the notion that the act unconstitutionally conferred legislative power on the director, by allowing him to decide whether to set minimum prices, and to fix such prices. In addition, we rejected broad challenges (asserting violations of both the "judicial powers" and "legislative powers" clauses (Cal. Const., arts. VI, § 1, IV, § 1)), to the director's authority to employ "judicial power . . . in that he is empowered to hold hearings at which evidence is produced and findings of fact are made by him." (13 Cal.2d at p. 659.)

Nonetheless we invalidated—on grounds that it violated the Constitution's judicial powers clause—a provision allowing the director to entertain and resolve complaints by milk producers against milk distributors. The challenged section permitted the director to "determine the amount of damage, if any, to which a complainant is entitled as a result of a failure of the distributor to pay for fluid milk or fluid cream as in this chapter provided, and in such case the director may make an order directing the offender to make reparation and pay to such person complaining such amount on or before the date fixed in the order." (13 Cal.2d at p. 651.)[5] Responding to the contention that this provision improperly clothed the director with judicial power, we stated, "There can be no answer to this contention. No citation of authority is necessary to support the same. While the attorney-general does not concede the invalidity of this provision of said section, he makes no attempt to defend its constitutionality, and we must therefore assume that he recognizes the serious defect in this provision of said section. . . ." (*Id.*

---

[5] Nothing in the statute purported to make the fixing of such "damages" (and the order that reparation be made) a condition of an order for license suspension or revocation. We note, however, that the act prohibited distributors from dealing in fluid milk or cream without first having obtained a license from the director, and that the director was charged with the responsibility of issuing, suspending, and revoking licenses to milk distributors. Subsequent cases have held that a licensing agency may condition suspension or revocation of a license on the licensee's making restitution to a beneficiary of the regulation. (See *post*, fn. 9, and pp. 360-361.)

at pp. 651-652.) This summary statement constitutes the court's entire discourse on the issue.

Plaintiff asserts the director's power held unconstitutional in *Jersey Maid* is indistinguishable from the Board's authority to determine excess rents and order reparations under section 1809, subdivision (b). Plaintiff's premise is that the "damages" which the *Jersey Maid* court found to be beyond the agency's powers were merely restitutive in nature (i.e., the difference between the minimum price and the actual price). She reasons that because the milk board was prohibited from adjudicating and awarding such restitution in *Jersey Maid,* the Board here is likewise prohibited from doing the same (and, it follows, from imposing treble damages).

Precise interpretation of *Jersey Maid* is difficult; discussion of the damages issue was, at best, conclusory. It may be, as plaintiff suggests, that the court considered an award of "damages" *of any kind* to be beyond the board's powers. But because the *Jersey Maid* court did not explain or articulate the nature of the "serious defect" of the statutory provision, it is unclear whether that decision was based on plaintiff's view, or on some other rationale. For example, the *Jersey Maid* decision might have rested on a conclusion that the provision was unconstitutional because it did not specifically provide for judicial review of the administrative determination. (See *post*, pp. 361-362 [discussing the "principle of check"].)[6]

■ When, as here, a decision treats an issue in a "summary and conclusory" manner, and is "virtually devoid of reasoning," its authoritative status is undermined. (*City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 533 [162 Cal.Rptr. 327, 606 P.2d 362].) Moreover, we note that *Jersey Maid* addressed an issue of first impression without discussing precedents from other jurisdictions, or the policy implications of its rule. (*I.J. Weinrot & Son, Inc.* v. *Jackson* (1985) 40 Cal.3d 327, 336 [220 Cal.Rptr. 103, 708 P.2d 682].) Most important, as we explain below, the intervening five decades of case law show that unquestioning and rigid adherence to *Jersey Maid*'s holding would place us out of step with every sister-state court of this country that has considered administrative awards of "restitutive" damages. Given this fact, we decline to treat *Jersey Maid* with the same deference we would normally accord an earlier opinion under the doctrine of stare decisis.

---

[6] Amicus curiae for defendant Board suggests an alternative interpretation: "If . . . the *Jersey Maid* provision merely authorized an award of the difference between the amount actually paid for milk and the statutory minimum milk price, then the modifier 'if any' in the phrase 'damage, if any' would have been unnecessary because there would *always* be damage in the amount of this difference. Rather, this language suggests that the provision authorized awards to the producer for additional damages suffered as a consequence of the distributor's failure to pay the statutory minimum price." (Italics in original.)

■ We thus consider afresh the limits placed by article VI, section 1 of our Constitution on the remedial powers of administrative agencies.

## C. Constitutional Propriety of the Powers at Issue in This Case

The challenged powers exercised by the Board in this case are of two distinct kinds: (i) the power to adjudicate "excess rent" claims, and (ii) the power to award treble damages. We address them in turn.

### 1. The power to make "restitutive" money awards

As we explain below, prior California cases provide no direct guidance on the propriety of administrative restitutive money awards. Cases dealing with administrative licensing agencies, however, suggest that such agencies may properly order reparations as a probationary condition of a licensee, and hence these cases shed some light on the issue posed here. Moreover, the decisions of our sister states provide helpful guidance. The out-of-state decisions unanimously hold that an administrative agency may—consistently with the "judicial powers" doctrine—make restitutive money awards provided (i) doing so is reasonably necessary to effectuate the administrative agency's primary, legitimate regulatory purposes, and (ii) the "essential" judicial power remains ultimately in the courts, through review of agency determinations. We will conclude that these limitations on agency adjudication provide a reasoned and workable test by which to measure challenges under our Constitution's judicial powers clause, and will adopt that test as our own.

### a. California cases

Other than *Jersey Maid, supra,* 13 Cal.2d 620, we have found no California case addressing directly the authority of "nonconstitutional" agencies (*ante,* p. 355) to make restitutive money awards.[7] There is, however, at least

---

[7]Some cases recognize and approve administrative exercise of "judicial-like" powers (see, e.g., *People* v. *Sims* (1982) 32 Cal.3d 468, 479, fn. 8 [186 Cal.Rptr. 77, 651 P.2d 321] ["The fact that statewide and local administrative agencies are prohibited from exercising 'judicial power' by the California Constitution does not mean that agency proceedings and determinations may never be judicial in nature."]; *Ray* v. *Parker* (1940) 15 Cal.2d 275, 291-292 [101 P.2d 665]; *Whitten* v. *California State Board, etc.* (1937) 8 Cal.2d 444, 446 [65 P.2d 1296, 115 A.L.R. 1]; *Suckow* v. *Alderson* (1920) 182 Cal. 247, 249-250 [187 P. 965]). Some older cases contain language suggesting a more limited view of administrative power (e.g., *Western Metal, supra,* 172 Cal. 407, 410-413). Still other cases touch on the judicial powers clause in the course of discussing the proper procedure for judicial review of administrative decisions. (*Standard Oil Co.* v. *State Board of Equal.* (1936) 6 Cal.2d 557, 561 [59 P.2d 119]; *Whitten* v. *California State Board, etc., supra,* 8 Cal.2d 444, 445-446; *Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 81-85 [87 P.2d 848]; *Laisne* v. *Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831, 834-845 [123 P.2d 457] (but see *id.* at pp. 859-866 [Gibson, C. J., dis.]); *Dare*

one statute that authorizes similar administrative relief. The Fair Employment and Housing Commission (FEHC) is authorized to order reinstatement of employment "with . . . backpay" under Government Code section 12970, subdivision (a).[8] Additionally, another provision in the same act formerly allowed the FEHC to award "actual . . . damages" for housing discrimination. (Former Gov. Code, § 12987, subd. (2), Stats. 1980, ch. 992, § 4.) Neither statute has faced a challenge based on the agency's constitutional authority to order such remedies, although our courts have affirmed administrative decisions imposing such damages. (See *Stearns* v. *Fair Employment Practice Com.* (1971) 6 Cal.3d 205, 211, 214 [98 Cal.Rptr. 467, 490 P.2d 1155] [$250 damage award]; *Hess* v. *Fair Employment & Housing Com.* (1982) 138 Cal.App.3d 232, 234 [187 Cal.Rptr. 712, 33 A.L.R.4th 958] [$1,000 damage awards].)

Nor do our recent cases dealing with administrative authority to award compensatory or punitive damages shed significant light on the constitutional issue presented here. In *Youst* v. *Longo* (1987) 43 Cal.3d 64 [233 Cal.Rptr. 294, 729 P.2d 728], and *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379 [241 Cal.Rptr. 67, 743 P.2d 1323], we held the relevant *statutes* did not authorize awards of either compensatory or punitive damages by the California Horseracing Board, or punitive damages by the FEHC. Accordingly, we did not reach constitutional claims.[9]

v. *Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 794-795 [136 P.2d 304]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 138-144 [93 Cal.Rptr. 234, 481 P.2d 242].) No case, however, addresses the question posed here, i.e., the constitutional propriety of restitutive money awards by an administrative agency.

[8] Plaintiff suggests administrative authority under this statute is distinguishable from the present case because the FEHC—at least when it exercises authority over employment relations—is authorized by California Constitution, article XIV, section 1, to exercise judicial powers. We have not yet been called on to construe the applicability of this constitutional provision to that commission.

[9] In both cases, however, we made statements in dictum that have some relevance here. In *Youst, supra,* 43 Cal.3d at page 80, we held, inter alia, that the statutes did not empower the California Horseracing Board to award "*affirmative* compensatory relief such as tort damages." (Italics in original.) We reasoned that the board's powers, although broadly stated, were "*regulatory* in nature" and did not contemplate tort damages. (*Id.* at pp. 81-82, italics in original.) We also stated, "[c]ontrary to the Court of Appeal's conclusion, the power to award compensatory and punitive tort damages to an injured party is a judicial function." (*Id.* at p. 80.)

We noted without criticism, however, that the Board possessed powers to suspend licenses and impose fines (*id.* at p. 82), and we expressly declined to imply that the Board lacked "authority to require compensatory relief as a condition for reinstatement of licenses" (*id.* at p. 82, fn. 15).

In *Dyna-Med, supra,* 43 Cal.3d 1379, we construed a provision of the Fair Employment and Housing Act authorizing remedies including "backpay" for employees discriminated against by their employers. Again, *Dyna-Med* was a statutory interpretation case, and did not address constitutional concerns relating to administrative power; we held that the statute did not allow the commission to impose punitive damages. In the course of our discussion we

Some further understanding may be gleaned from the cases dealing with the remedial authority of administrative licensing agencies. It is well established, for example, that administrative agencies with licensing power also have the authority to revoke or suspend licenses. (See, e.g., *Kolnick v. Board of Medical Quality Assurance* (1980) 101 Cal.App.3d 80, 86-87.) We expressly "conceded" in *Suckow v. Alderson, supra,* 182 Cal. 247, a medical licensing case, that exercise of power to revoke a license is "judicial in its nature," and "quasi-judicial." (*Id.* at pp. 249-250.) Nevertheless, we concluded that such power did not violate article VI, section 1, because administrative boards "are not courts in the strict sense; they are not exercising 'the judicial power of the state' as that phrase is used in the constitution conferring judicial power upon courts, and . . . statutes creating such boards and conferring upon them such powers are constitutional." (*Id.* at p. 250.)[10]

In subsequent professional license revocation cases we rejected other "judicial power" challenges to administrative action. In so doing, we implied that so long as appropriate judicial review was available, the challenged administrative determination was not subject to attack on the ground of unlawful delegation of judicial power. (See, e.g., *Drummey, supra,* 13 Cal.2d 75, 84-85 ["It is the essence of judicial action that finality is given to findings based on conflicting evidence. If the statute be so construed it would violate the state Constitution. . . . [¶] In view of these principles, it necessarily follows that the court . . . must exercise an independent judgment on the facts."]; *Laisne, supra,* 19 Cal.2d 831, 840 ["[A vested property right] cannot be finally destroyed by a nonjudicial body if the action of that body is questioned in a court of law in a mandate proceeding. [¶] [I]f finality were given to the action of an administrative agency, such would be an unconstitutional exercise of judicial power."]; see also *Bixby, supra,* 4 Cal.3d 130, 142-143.) These decisions recognized—as a limiting condition on administrative power—what Professor Davis has later termed the "principle of check": "In the organic arrangements that we have been making in recent decades in the establishment and control of administrative agencies, the principle that has guided us is the principle of check, not the principle of separation of powers. We have had little or no concern

---

described remedies such as backpay as different from punitive damages because such remedies are "exclusively corrective and equitable in kind. They relate to matters which serve to make the aggrieved employee whole in the context of the employment." (*Id.* at p. 1387.)

[10] Later, in *Whitten, supra,* 8 Cal.2d 444, 446, we again addressed a board's power to revoke a license, stating, "we think that the sounder conclusion, in view of changing and increasing governmental activities, is that such boards are actually engaged in enforcing administrative determinations. Agencies engaged in making administrative determinations, unlike courts, have the power and the facilities to investigate and initiate action and, more or less informally, find the facts which under the law justify a course of action. They cannot and do not declare the law but perform the sole duty of ascertainment. . . ."

for avoiding a mixture of three or more kinds of power in the same agency; we have had much more concern for *avoiding or minimizing unchecked power.* The very identifying badge of the modern administrative agency has been the combination of judicial power (adjudication) with legislative power (rule making). . . ." (1 Davis, Administrative Law Treatise (1958) § 1.09, pp. 68-69, italics added.)

We have never held, however, that the mere availability of judicial review insulates all forms of administrative adjudication from constitutional challenge under the judicial powers clause. And, we note, none of our prior cases involved an administrative restitutive award. The question arises whether, even assuming appropriate judicial review is assured, an administrative agency may constitutionally adjudicate restitutive money claims. Once again, we derive some illumination from our licensing cases.

Some commentators suggest that a licensing board's authority to revoke or suspend licenses stems from the inherent strength of the police power itself. Professor Brown, for example, reasons that the administrative board's authority to grant a license necessarily implies an authority to regulate license holders, and to take appropriate disciplinary action against those who violate licensing standards. (Brown, *Administrative Commissions and Judicial Power* (1935) 19 Minn.L.Rev. 261, 287-288; see also Jaffe, Judicial Control of Administrative Action (1966) p. 114.) But if an administrative board's exercise of "judicial-like" power is justified as a reasonable means of effectuating its regulatory goal, it is difficult to explain why a price control board may not order restitution in order to effectuate its own regulatory goal—unless an order for monetary recovery is itself of such a character that it is purely judicial, and may be imposed only by a court.

The cases, however, have not suggested that an order for monetary recovery per se is of such character that it may be made only by a court. In practice, our administrative agencies commonly order money reparations, as when restitution is imposed as a probationary term on a licensee (e.g., *Russell* v. *Miller* (1943) 21 Cal.2d 817, 818 [136 P.2d 318] [electrical contractor's license suspended "until defendant makes restitution" to his client "satisfactory to the Registrar of Contractors"]; *American Funeral Concepts* v. *Board of Funeral Directors & Embalmers* (1982) 136 Cal.App.3d 303, 308 [186 Cal.Rptr. 196] [license conditionally revoked; licensee subject to 300-day suspension on condition it make restitution]), and we have referred to the exercise of such power with apparent approval. (*Youst* v. *Longo, supra,* 43 Cal.3d 64, 82, fn. 15 ["We do not mean to imply that the Board is

without authority to require compensatory relief as a condition for reinstatement of licenses."].)[11]

One recent Court of Appeal decision discussed the implications of administrative power to make restitutive money awards. *McKee* v. *Bell-Carter Olive Co.* (1986) 186 Cal.App.3d 1230 [231 Cal.Rptr. 304], involved an administrative body that regulates the conduct of its licensees—food "processors"—in relation to the processors' suppliers, food growers.[12] Among other things, the administrative board has authority to entertain a grower's complaint that a processor has failed to pay for products under a contract, and to suspend a processor's license until restitution is paid to the grower.[13] Addressing the grower's assertion that the administrative scheme failed to provide a remedy for recovery of his claimed damages (restitutive, compensatory and punitive), the *McKee* court stated: "It is certainly true . . . that despite this broad statutory framework, the Director has no authority to award damages directly. . . . [T]his apparently stems from the decision of the California Supreme Court in *Jersey Maid.* . . .

"Nevertheless, [Food and Agriculture Code] sections 55749 and 55851 make clear that once the Director has determined a [grower] is entitled to payment from a licensed processor, the Director may indirectly compel compliance with such an order by conditioning suspension of the processor's license upon payment of the money due the [grower]. Setting aside for the moment plaintiff's claims for damages in excess of the contract price, resort to the statutory remedy would have sufficed to make plaintiff whole, i.e., to attain for him the properly computed contract price for his olives. Thus while the statutory procedure is facially punitive, its effect is to provide an administrative remedy clearly relevant to plaintiff's claim. *Notwithstanding the Director's inability to directly order the payment of damages, the Director's power to conditionally suspend a processor's license until payment*

---

[11] Of course a licensee (unlike plaintiff in this case) in theory has the option to reject, on pain of license revocation, the administrative agency's probationary terms.

[12] Under Food and Agricultural Code section 55401 et seq., the Director of the Bureau of Marketing Enforcement licenses processors of farm products. A grower who has been refused a contract payment by a processor has two options: he may enforce a producer's lien in court, or he may seek administrative relief from the director.

If he selects the administrative remedy, the grower files a complaint. Thereafter, the director must review the processor's accounts. If he finds a violation of law—including failure or refusal to pay the grower for "farm products"—he may issue a complaint against the processor. If the director cannot effect settlement of the dispute, he may hold a hearing for which he may issue subpoenas, and at which he may take testimony, and decide if the processor has violated the law. (186 Cal.App.3d at p. 1236, citing Food & Agr. Code.)

[13] If the director finds a processor has failed to pay a grower for his products, the director "may issue an order which suspends or revokes the processor's license or places such license under such probationary terms and conditions as may be necessary to obtain compliance with the provisions of this chapter by such licensee." (Food & Agr. Code, § 55749.)

*of reparations is made is the practical equivalent of such power* and, in fact, the most power which can constitutionally be afforded the Director in light of the decision in *Jersey Maid* . . . . The detailed procedure outlined by the statutes makes clear the Director's power is more than mere investigatory power without any procedural mechanism by which the person aggrieved can obtain relief. . . ." (186 Cal.App.3d at p. 1238, italics added.) The court concluded that the statutes provided an "administrative remedy" for a grower "who contends that . . . a processor . . . failed to compensate him in accordance with the terms of their contract." (*Id.* at p. 1239.)[14]

Plaintiff here appears to concede the exercise of this type of restitutive/remedial power by a licensing board does not violate article VI, section 1 of our Constitution. She does not attempt to explain, however, why the same remedial power offends the Constitution in the present context merely because it is exercised by a regulatory board that does not also exercise a licensing function.[15] As a practical matter, the administrative agency performs the same function in both instances: determining restitutive compensation, and ordering payment in furtherance of an underlying regulatory purpose.

In conclusion, although we acknowledge the constitutional importance of ensuring judicial review of administrative determinations, our prior cases do not stand for the proposition that an administrative agency may exercise all manner of "judicial-like" power on the simple condition that judicial review of the administrative decision remains available. On the other hand, our prior licensing cases have accepted without constitutional debate the authority of licensing agencies to impose a restitutive award as a probationary

---

[14] The *McKee* court, of course, was bound by our *Jersey Maid* decision. (*Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) The result in *McKee,* although consistent with the modern trend throughout the nation (see *post,* pp. 365-371), might have been questioned in light of *Jersey Maid* itself, which involved a virtually identical licensing scheme. (See *ante,* fn. 5.) We conclude today, however, that this aspect of *Jersey Maid* should not be accorded precedential weight.

[15] The only court to consider that distinction has rejected it. *Plasti-Line, Inc.* v. *Human Rights Com'n* (Tenn. 1988) 746 S.W.2d 691, involved the constitutional authority of an antidiscrimination commission. The defendant asserted that because the commission did not exercise licensing power, its adjudication of disputes between private litigants "is not appropriate for an administrative agency and is exclusively a function of the state judicial department." (*Id.* at p. 693.) The Tennessee Supreme Court responded by noting that throughout most of the country, workers' compensation claims are determined by administrative agencies not involved in licensing, and which lack constitutional authority to exercise truly "judicial" powers (California, of course, is an exception; see Cal. Const., art. XIV, § 4), and yet such schemes "have almost universally been held constitutional." (746 S.W.2d at p. 693; see, e.g., *Nevada Indus. Commission* v. *Reese* (1977) 93 Nev. 115 [560 P.2d 1352, 1353-1356]; *Wylie Corp.* v. *Mowrer* (1986) 104 N.M. 751 [726 P.2d 1381, 1382-1383] [overruling *State* v. *Mechem* (1957) 63 N.M. 250 (316 P.2d 1069, 1070-1072)]; Jaffe, Judicial Control of Administrative Action, *supra,* p. 97.)

term on a licensee, and these cases do not foreclose the possibility that, under appropriate circumstances, an agency without licensing power should likewise be allowed to make such restitutive awards. For additional guidance on this latter point, we turn to decisions of our sister states.

b. *Sister-state cases*[16]

Our constitutional provision confining "judicial powers" to the courts (Cal. Const., art. VI, § 1) has counterparts in most other state constitutions, as well as the federal Constitution. (See *post*, fn. 24 [state constitutional provisions]; U.S. Const., art. III, § 1 [reservation of judicial powers to the courts].) Modern courts, however, have not rigidly construed these provisions.[17] Instead, a more tolerant approach to the delegation of judicial powers has emerged out of a perceived necessity to accommodate administrative

---

[16]Preliminarily, we note that some United States Supreme Court cases address, in the context of article III of the federal Constitution, issues similar to those posed here. (See, e.g., *Commodity Futures Trading Comm'n v. Schor* (1986) 478 U.S. 833 [92 L.Ed.2d 675, 106 S.Ct. 3245] [upholding commission's jurisdiction over counterclaim state cause of action in reparations action; court emphasized parties' consent to agency adjudication] [discussed *post*, fn. 58]; *Thomas v. Union Carbide Agric. Products Co.* (1985) 473 U.S. 568 [87 L.Ed.2d 409, 105 S.Ct. 3325] [approving administrative determination of money claims between private parties subject to administrative regulation]; *Northern Pipeline Co. v. Marathon Pipe Line Co.* (1982) 458 U.S. 50, 92 [73 L.Ed.2d 598, 628, 102 S.Ct. 2858] ["[A] 'traditional' state common-law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent the consent of the litigants, be heard by an 'Art. III court' if it is to be heard by any court or agency of the United States."] [Burger, C. J., dis.]; *Crowell v. Benson* (1932) 285 U.S. 22, 51 [76 L.Ed. 598, 612-613, 52 S.Ct. 285] [workers' compensation agency has authority to decide "a private right, that is, of the liability of one individual to another"]; see also *Atlas Roofing Co. v. Occupational Safety Comm'n* (1977) 430 U.S. 442, 454-455 [51 L.Ed.2d 464, 475, 97 S.Ct. 1261] [upholding commission's power to adjudicate and impose fines: " 'We may assume that the Seventh Amendment would not be a bar to a congressional effort to entrust landlord-tenant disputes, including those over the right to possession, to an administrative agency.' "] [discussed *post*, pp. 383-384].)

Both parties, sometimes quoting the same language, assert these cases support their respective views that the rent board may, or may not, adjudicate the "excess rent" claims involved here. We find, however, that the cited cases provide no clear guidance on the judicial powers question posed here. (See Fallon, *Of Legislative Courts, Administrative Agencies, and Article III* (1988) 101 Harv.L.Rev. 915 [criticizing the high court's analysis in the above cases and proposing that availability of judicial review should be sufficient to protect the values underlying the separation of powers/judicial powers doctrine].) Suffice it to say that the state cases cited below, and our holdings in this case, do not conflict with the holdings of these high court cases construing the federal Constitution.

[17]One commentator has written: "It was for a long time maintained by both eminent textwriters and by the courts . . . that the legislature is powerless to delegate judicial duties to administrative officers. [¶] But candor compels recognition of the hard fact that these statements have become mere shibboleths, shattered by the hard course of decision—reverently repeated, but not followed in practice. [¶] . . . Though the old rubrics prohibiting delegation are still occasionally repeated, they no longer shape decision." (1 Cooper, State Administrative Law (1965) pp. 46-47, 48, fns. omitted.)

adjudication of certain disputes and thereby to cope with increasing demands on our traditional judicial system.[18]

The accommodating view of modern courts, however, generally has been conditioned by two limiting principles, one procedural and the other substantive. First, our sister-state cases, like our own (*ante* at p. 361), universally recognize the constitutional necessity of the "principle of check." They hold the availability of judicial review of administrative decisions is sufficient to satisfy the "principle of check."[19]

The substantive limitation is expressed in an opinion of the New Hampshire Supreme Court: "As a rule which meets most situations, when an executive board has regulatory functions, it may hear and determine controversies which are incidental thereto, but if the duty is primarily to decide questions of legal right between private parties, the function belongs to the judiciary. . . . [¶] The creation of an executive board is justified if its service is to determine and maintain a public right or interest. To accomplish its purposes judicial powers may be necessarily exerted. But they must concern matters of an executive character. They are proper if it may fairly be said that there is need of them in order to produce an efficient and effective administrative enforcement of the public interest. . . . [¶] Whatever the borderland of doubt and interchange, argument seems unneeded to demonstrate that the function of trying and deciding litigation is strictly

---

[18] See, e.g., *County Coun., Montgomery Cty.* v. *Investors F. Corp.* (1973) 270 Md. 403 [312 A.2d 225, 241-242]; *City of Waukegan* v. *Pollution Control Board* (1974) 57 Ill.2d 170 [311 N.E.2d 146, 147-153, 81 A.L.R.3d 1246]; *State Insurance Commissioner* v. *National Bureau of Casualty Underwriters* (1967) 248 Md. 292 [236 A.2d 282, 285-287]; *Department of Natural Resources* v. *Linchester Sand & G. Corp.* (1975) 274 Md. 211 [334 A.2d 514, 521]; see also Brown, *Administrative Commissions and the Judicial Power, supra,* 19 Minn.L.Rev. 261, 262-265, and authorities cited. Our court as well has previously noted the importance of administrative agencies in our modern government. In *Bixby, supra,* 4 Cal.3d 130, 142, we stated: "To deal with the manifold problems of modern society . . . administrators have been delegated substantial . . . quasi-adjudicative powers. [Citations.] Initially, the courts reacted to this executive expansion with the suspicion and fear that the burgeoning bureaucracy would endanger the prevailing concepts of individual rights. [Citations.] Yet troubled times forced the courts to recognize that the new administrative tools were essential to cope with new complexities. [Citations.]"

[19] See *Kentucky Com'n on Human Rights* v. *Fraser* (Ky. 1981) 625 S.W.2d 852, 855; *City of Waukegan, supra,* 311 N.E.2d 146, 151-152; *Jackson* v. *Concord Company* (1960) 54 N.J. 113 [253 A.2d 793, 800]; see also *David* v. *Vesta Co.* (1965) 239 Md. 430 [212 A.2d 345, 359]; see generally, *Brown, supra,* 19 Minn.L.Rev. at pages 270-275; *Fallon, supra,* 101 Harv.L.Rev. 915 (proposing "appellate review theory" to determine permissible powers of non-article III federal tribunals). Other courts have expressed the same concern in terms that suggest a requirement of actual judicial approval (as opposed to mere "availability" of judicial review) in each case. See *Plasti-Line, Inc.* v. *Human Rights Com'n, supra,* 746 S.W.2d 691, 693; *Percy Kent Bag Co.* v. *Missouri Com'n, etc.* (Mo. 1982) 632 S.W.2d 480, 484; *Investors, supra,* 312 A.2d 225, 243; see also *General Drivers & Helpers U.* v. *Wisconsin Emp. Rel. Bd.* (1963) 21 Wis.2d 242 [124 N.W.2d 123, 128].

and exclusively for the judiciary when it is between private parties, neither of whom seeks to come under the protection of a public interest and to have it upheld and maintained for his benefit." (*In re Opinion of the Justices* (1935) 87 N.H. 492 [179 A. 344, 345-347, 110 A.L.R. 819.)[20]

With these two principles in mind, we review the decisions of our sister states.

At least nine states, all of which have constitutional provisions substantially identical to California Constitution, article VI, section 1, have considered the propriety of administrative adjudication of restitutive and compensatory "damages." The decisions unanimously hold such remedial power as is involved here does not constitute an impermissible exercise of judicial power. In order to provide more explicit illumination, we will discuss in detail two decisions which, in our view, best express the "limiting principles" mentioned above.

The Maryland Constitution, like ours, provides that the "judicial power" of the state is vested in the state high court and lower courts. (Compare Md. Const., art. IV, § 1,[21] with Cal. Const., art. VI, § 1 [quoted *ante*, p. 355].) In *Investors, supra,* 312 A.2d 225, the Maryland high court considered a challenge under its constitution's judicial powers provision to the authority of a "Fair Landlord-Tenant Relations" board. The board was established by local government to "comprehensively regulate the apartment rental business." (312 A.2d at p. 227.) Although the board did not have the authority to set rents, it was given the power to regulate and adjudicate all manner of landlord-tenant relations and disputes concerning "defective tenancies," and to make various remedial orders to enforce its regulations and decisions.

An assortment of remedial powers conferred on the landlord-tenant board were challenged: "(1) to impose a civil penalty not exceeding $1,000; [¶] (2) to award money damages [to either party] not exceeding $1,000; [¶] (3) to award payments for temporary substitute housing; [¶] (4) to terminate leases; [¶] (5) to order repairs; [and] [¶] (6) to order the return of security deposits and rental moneys paid." (312 A.2d at p. 238.)

The landlords asserted such remedial powers were judicial in nature, and therefore could not be exercised by the administrative agency. (312 A.2d at

---

[20] See also, e.g., *Zahorian* v. *Russell Fitt Real Estate Agency* (1973) 62 N.J. 399 [301 A.2d 754, 761-762, 61 A.L.R.3d 927]; accord, *State Human R. Com.* v. *Pearlman* (1977) 161 W.Va. 1 [239 S.E.2d 145, 147]; Jaffe, Judicial Control of Administrative Action, *supra,* page 97.

[21] "The Judicial power of this State is vested in a Court of Appeals, such intermediate courts of appeal as the General Assembly may create by law, Circuit Courts, Orphans' Courts, and a District Court. These Courts shall be Courts of Record . . . ."

p. 243.) Rejecting that claim, the court first noted that the board did not make "final," but merely "initial" decisions, because an aggrieved party could seek judicial review of the board's decision. Nor, the court reasoned, was the board's decision "binding": the board had no power to enforce its orders; instead, court action was necessary to enforce the board's orders. Thus, the court concluded, the "principle of check" stressed by Professor Davis, *ante,* page 361, was not violated by the administrative adjudicatory scheme. (*Ibid.*)

The court next specifically rejected the landlords' claims that "the remedies entrusted to the [board's] discretion are remedies exclusively reserved to the courts" (312 A.2d at p. 244), and instead found all of the above-listed remedial powers were proper. The court explained that the " 'pivotal point in determining the permissible extent of delegable adjudicatory functions is not merely their inherent nature but the context of the regulatory scheme and the enforcement procedure provided by the administrative process.' " (312 A.2d at p. 245.) Considering the exercise of the listed remedial powers "in the context of the regulatory scheme," the court approved the use of such powers as being "reasonably necessary" to the board's regulatory goals: "We think it plain that the function of the [board] is primarily administrative and the power vested in it to hear and determine controversies involving landlords and tenants is granted only as an incident to its administrative duty; in other words, the [board's] function is not primarily to decide questions of legal rights between private parties, but [that remedial role] is merely incidental, although reasonably necessary, to its regulatory powers." (*Id.,* at pp. 245-246.)[22]

The Missouri Constitution also provides that the state's judicial power resides in the state high court and the lower courts. (Compare Mo. Const., art. V, § 1,[23] with Cal. Const., art. VI, § 1 [quoted *ante,* p. 355].) In *Percy Kent Bag Co., supra,* 632 S.W.2d 480, the Missouri Supreme Court upheld, against a judicial powers challenge, the constitutionality of a statute that permitted a state antidiscrimination commission to exercise discretionary power to award backpay to complainant employees. The court "distinguished" a decades old prior opinion on the ground, inter alia, that its

---

[22] In addition, the court addressed the provision authorizing the board to impose a "civil penalty" up to $1,000 for violation of the landlord-tenant laws. It stressed that such a power may constitutionally be delegated to an administrative agency (*id.,* at p. 246). (Indeed, a number of other state cases are in accord, see *post,* fn. 45.) The court struck the penalty provision before it, however, because the law provided no standard by which the board was to impose penalties. Because the board was free to exercise unguided discretion in making such awards, with the consequence that there could be "no meaningful judicial review," the court held the civil penalty provision as drafted was illegal. (*Ibid.*)

[23] "The judicial power of the state shall be vested in a supreme court, a court of appeals consisting of districts as prescribed by law, and circuit courts."

statement therein, that determination of money recovery is a judicial function reserved to the courts alone, was dictum. (*Id*. at p. 483.) But the court noted a "more important" reason why the defendant's reliance on the prior opinion was "misplaced": "[I]t fails to recognize the enormous changes that have occurred in the area of administrative law in this state and nationally during the intervening years. As was stated in *Sunshine Anthracite Coal Co. v. Adkins* [(1940) 310 U.S. 381, 400] in overruling a similar delegation of powers argument, 'To hold that there was [an unconstitutional delegation] would be to turn back the clock on at least a half a century of administrative law.'" (632 S.W.2d at pp. 483-484.)

The Missouri court acknowledged that in exercising its authority the commission necessarily determined factual questions, and exercised discretion, and that it thereby "does exercise judicial functions." (632 S.W.2d at p. 484.) Nevertheless, the court reasoned, this did not constitute exercise of "true judicial power." It defined such power as "'the power to "decide and pronounce a judgment and carry it into effect . . ."'" (*ibid*.), and noted that the commission had no such "final" authority: "It determines if the respondent employer has discriminated against the complainant, and it determines what orders to issue. But it cannot 'pronounce a judgment and carry it into effect;' only a court can enforce the Commission's order. A party aggrieved by the Commission's order may obtain judicial review of that order. [Citation.] After review, there is a *judgment* from a court to be enforced. If a decision is not appealed, the Commission must obtain a court order to enforce the Commission's order. [Citation.] Of course, the respondent, against whom an order has been issued, may comply voluntarily with that order." (*Ibid*., italics in original.)

Decisions of New Jersey, Wisconsin, Oregon, West Virginia, Tennessee, Kentucky and Florida—all of which have "judicial powers" provisions substantially identical to article VI, section 1 of our own Constitution[24] — are substantially in accord with the principles enunciated by the Maryland and Missouri courts. (*New Jersey*: *Jackson* v. *Concord Co., supra,* 253 A.2d 793, 800 ["[A]t this advanced date in the development of administrative law, we see no constitutional objection to legislative authorization to an administrative agency to award, as incidental relief in connection with a subject delegable to it, money damages, ultimate judicial review thereof being available."]; see also *Zahorian, supra,* 301 A.2d 754, 760-763 [permitting housing discrimination agency to award restitutory damages for

---

[24] Compare California Constitution, article VI, section 1 (quoted *ante*, p. 355), with New Jersey Constitution, article IV, section 1; Wisconsin Constitution, article 7, section 2; Oregon Constitution, article VII, section 1; West Virginia Constitution, article 8, section 1; Tennessee Constitution, article 6, section 1; Kentucky Constitution, section 109; and Florida Constitution, article V, section 1.

"economic loss," and "minor" or "incidental" damages for "emotional distress"]; see generally *David* v. *Vesta Co., supra,* 212 A.2d 345, 357 [" 'If the doctrine of the separation of powers were a doctrinaire concept to be made use of with pedantic rigor, the use of the modern administrative agency would have been an impossibility in our law.' "]; *Wisconsin: General Drivers & Helpers U., supra,* 124 N.W.2d 123, 127 [state employee relations board's order of money damages to cover backpay and vacation pay does not constitute the exercise of " 'judicial powers within the meaning of the Constitution' "];[25] *Oregon: Williams* v. *Joyce* (Ore.Ct.App. 1971) 479 P.2d 513, 522 ["There is no constitutional impediment which bars the legislature from authorizing an administrative agency to award damages."]; *West Virginia: State Human Rights Commission* v. *Pauley* (W.Va. 1975) 212 S.E.2d 77, 80 [agency awarded actual and punitive damages; court concluded there is "no constitutional objection to legislative authorization of such an award by an administrative agency"]; *Pearlman, supra,* 239 S.E.2d 145, 147-148 [extending *Pauley* to expressly allow administrative award of damages for humiliation, even if no monetary loss is proved]; *Kentucky: Fraser, supra,* 625 S.W.2d 852, 854 [discrimination commission's authority to award damages for "humiliation and embarrassment" does not constitute "unconstitutional delegation or usurpation of judicial powers"];[26] *Tennessee: Plasti-Line, supra,* 746 S.W.2d 691, 692-693 [following *Fraser, supra,* 625 S.W.2d 852, and *Percy Kent Bag Co., supra,* 632 S.W.2d 480];[27] *Florida: Laborers' Intern., L. 478* v. *Burroughs* (Fla.Dist.Ct.App. 1987) 522 So.2d 852, 856

---

[25] The court continued: "[The Board is] 'an administrative body or arm of the government, which in the course of its administration of a law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts *quasi*-judicially; but it is not thereby vested with judicial power in the constitutional sense.' " (124 N.W.2d 123, 127.) The authority to make money awards, the court held, has the same "status"—in terms of its effect on "governing personal conduct"—as does the board's recognized authority to issue cease and desist orders. "Thus, we find no violation under sec. 2, Art. VII of the Wisconsin Constitution which vests judicial power in the courts." (*Ibid.*)

[26] The court reasoned: "The mere fact that the Commission is involved in adjudication does not in itself render the statute unconstitutional as a usurpation of judicial power. Administrative agencies are frequently involved in the adjudication of disputes (Worker's Compensation, Unemployment Compensation, reparations before the Interstate Commerce Commission, and the like). . . . In Kentucky, and elsewhere, this authority of administrative bodies extends to the determination of liabilities between individuals . . . . The substantial trend of authority extends administrative powers of adjudication to encompass the award of damages. [Citations.] We find nothing unconstitutional in the administrative award of damages under this statute where due process procedural rights have been protected, where prohibited conduct has been well defined in the governing statute, and where judicial review is available." (*Id.* at pp. 854-855.)

[27] The *Plasti-Line* court stressed that the commission's remedial orders are not self-executing, but instead required an enforcement order from the court. (746 S.W.2d at p. 693.)

(opn. on rehg.) [upholding administrative imposition of "back pay" and "front pay" in employment discrimination case].[28]) [29]

All of the foregoing sister-state decisions support an expansive view of constitutionally permissible administrative powers. Indeed, some contain broad statements that in our view may well accord too little consideration to the "substantive limitations" principle discussed above. We explain below the guiding principles we glean from these decisions.

c. *Guiding principles: substantive and procedural limitations on the remedial power of administrative agencies*

Although many of these decisions—including *Investors, supra,* 312 A.2d 225—were discussed in the brief of amicus curiae for defendant, plaintiff

---

[28] The court relied on *Broward County* v. *La Rosa* (Fla. 1987) 505 So.2d 422, in which the Florida high court held unconstitutional, under the state judicial powers clause, the authority of a local human rights board to award "nonquantifiable" damages for "humiliation and embarrassment." The *Broward County* court stated, "we cannot imagine a more purely judicial function than a contested adjudicatory proceeding involving disputed facts that results in an award of unliquidated common law damages for personal injuries in the form of humiliation and embarrassment." (*Id.* at pp. 423-424.) In a footnote to that statement, however, the court strongly suggested that a restitutive award such as is involved in this case would be within an administrative agency's constitutional authority: "We see a significant distinction between administrative awards of quantifiable damages for such items as *back rent or back wages* and awards for such nonquantifiable damages as pain and suffering or humiliation and embarrassment." (*Id.* at p. 424, fn. 5, italics added.)

[29] Other courts have rejected broad attacks on administrative power to award monetary damages, but have not addressed expressly the constitutional issue posed here. See *Massachusetts Com'n Against Discrim.* v. *Franzaroli* (1970) 357 Mass. 112 [256 N.E.2d 311, 312-313] (antidiscrimination commission awarded economic and "mental distress" damages; "We find nothing improper in the commission's exercise of that authority"); *Bournewood Hosp.* v. *Mass. Comm. Against Discrim.* (1976) 371 Mass. 303 [358 N.E.2d 235, 241-243] [same]; *State Commission for Human Rights* v. *Speer* (1971) 29 N.Y.2d 555 [324 N.Y.2d 297, 272 N.E.2d 884] (mem. opn.) (antidiscrimination commission may award monetary damages for "mental distress"); *Batavia Lodge No. 196, L.O.M.* v. *New York St. D. of H.R.* (1974) 35 N.Y.2d 143 [359 N.Y.S.2d 25, 316 N.E.2d 318, 319-320] [same]; *State by Johnson* v. *Porter Farms, Inc.* (Minn.Ct.App. 1986) 382 N.W.2d 543, 550-551 [affirming and revising administrative award of compensatory, emotional distress, and punitive damages, as well as attorney fees); *Hall* v. *Gus Const. Co., Inc.* (8th Cir. 1988) 842 F.2d 1010, 1017 ["The Iowa Supreme Court has construed [a specified statute] as authorizing an administrative agency to award compensatory damages but has not decided whether the statute is constitutional."]; *Continental Can Co., Inc.* v. *State* (Minn. 1980) 297 N.W.2d 241, 251 [18 A.L.R.4th 312]; *A.P. Green Serv. D. of Bigelow-L. Corp.* v. *State F.E.P.C.* (1974) 19 Ill.App.3d 875 [312 N.E.2d 314].

Additionally, courts have frequently approved the exercise by antidiscrimination commissions, and other boards, of broad remedial powers to issue injunctions, cease and desist orders, etc. (E.g., *State* v. *Bergeron* (1971) 290 Minn. 351 [187 N.W.2d 680, 682-684] [state antidiscrimination commission has power to remedy illegal transfers of real property by compelling defendant to cancel a fraudulent transfer, and offer the property for sale to the person discriminated against].) At least one court has noted the similarity between the power to issue injunctions governing personal conduct, and the power to "issue orders to pay money." (See *General Drivers, supra,* 124 N.W.2d at p. 127.)

has neglected to address them. We conclude, however, that the veritable tidal wave of decisions against plaintiff's view cannot be ignored, and that our sister states' decisions on this issue suggest a workable solution to the constitutional problem posed here.

The better analyzed and more thoughtful decisions, as we read them, set out the following guidelines: An administrative agency may constitutionally hold hearings, determine facts, apply the law to those facts, and order relief—including certain types of monetary relief—so long as (i) such activities are authorized by statute or legislation and are *reasonably necessary* to effectuate the administrative agency's *primary, legitimate regulatory purposes,* and (ii) *the "essential" judicial power* (i.e., the power to make enforceable, binding judgments) *remains ultimately in the courts, through review of agency determinations.* As noted above, the "procedural" aspect of this test (*ante* at p. 361) is entirely consistent with (and indeed, dictated by) established California law concerning administrative revocation of professional licenses (*ante* at p. 361). We review below the merit, scope, and propriety of our sister states' substantive limitations on administrative remedial power.

(i) *Substantive limitations on the remedial power of administrative agencies*

The view of the judicial powers doctrine embraced by our sister states has the advantage of avoiding meaningless, wooden distinctions (used in a number of older cases) between "quasijudicial" and "judicial" powers,[30] and at the same time remaining true to the fundamental teaching of the various constitutional judicial powers clauses. The decisions forthrightly recognize that administrative agencies do indeed exercise "judicial-like" powers, and accept the need for broad administrative powers in our increasingly complex government. At the same time, the view espoused by our sister states includes a crucial and workable limiting principle: The agency may exercise *only those powers that are reasonably necessary to effectuate the agency's primary, legitimate regulatory purposes.* Thus, contrary to plaintiff's suggestions, we perceive no danger that the view of judicial power embraced by our sister states will lead to a proliferation of agencies created to adjudicate specialized private disputes, thereby undermining the traditional role of the

---

[30] Use of the bare term "quasijudicial," as a means of distinguishing between permissible and nonpermissible administrative functions, has been justly criticized as perpetrating an unworkable standard. (See *Fed. Trade Comm'n v. Ruberoid Co.* (1952) 343 U.S. 470, 487-488 [96 L.Ed. 1081, 1094-1095, 72 S.Ct. 800] (Jackson, J., dis.); Cooper, *supra,* State Administrative Law, pp. 50-50; Schwartz, Administrative Law (1984) § 21, pp. 34-35; see also *Strumsky, supra,* 11 Cal.3d at p. 42, fn. 14.) If, on the other hand, the term "quasijudicial" were understood as encompassing administrative powers meeting the test set out herein, use of the term as a shorthand means of describing the permissible scope of administrative power would be unobjectionable.

courts. Plaintiff's fears have not materialized in other states, and many of the decisions expressly caution against any such intrusion.[31]

Practical considerations also militate against a less accommodating view of the judicial powers doctrine. If nonconstitutional administrative agencies were barred from adjudicating all money claims between private individuals who are subject to administrative regulation, such agencies would be precluded from exercising powers routinely employed, and not previously challenged.[32] For example, the authority of the FEHC to award backpay might thereby be called in doubt (see *ante,* fn. 8), and the authority of licensing agencies to adjudicate and conditionally order restitution (*ante,* pp. 362-364) might also be questioned.

(ii) *Procedural limitations on the remedial powers of administrative agencies*

In addition to placing reasoned and workable substantive limitations on the remedial powers of administrative agencies, the view of the judicial powers doctrine embraced by our sister states also reserves to the courts the "true" judicial power. Consistently with our prior cases dealing with administrative revocation of professional licenses, the decisions uphold an agency's authority to exercise a challenged remedial power only if the administrative scheme also respects the "principle of check" by providing for judicial review of administrative determinations. It remains, of course, to resolve in different categories of cases, the procedures for and scope of judicial review necessary to fulfill the goal of reserving to the courts this essential attribute of judicial power.[33]

---

[31] The New Jersey Supreme Court, in *Zahorian, supra,* 301 A.2d 754, noted: "But it would seem entirely evident that the recognition of administrative authority to make minor or incidental awards need not carry with it any authority to entertain a matter where, because of the severity of the consequential injury and the extensiveness of the claim, the item of damages has become primary and the other relief [a cease and desist order in a race discrimination case] incidental rather than the reverse." (*Id.,* at pp. 761-762; accord, *Pearlman, supra,* 239 S.E.2d 145, 147.)

[32] Discussing a similar point of federal constitutional law, Professor Fallon has noted: "Legislation always enjoys a presumption of constitutionality, and a court should be especially hesitant to embrace a theory or principle that requires the invalidation of large numbers of important statutes. It is one thing to strike down a relatively isolated provision, quite another to demand widespread reform of entrenched institutional practice. [Footnote omitted.]" (*Fallon, supra,* 101 Harv.L.Rev. 915, 921.) The omitted footnote reads: "The presumption against displacing even widespread statutory practice is of course not irrebuttable. Cf. Immigration & Naturalization Serv. v. Chadha, 462 U.S. 919, 944 (1983) (holding 'legislative veto' provisions unconstitutional, despite the existence of '295 congressional veto-type procedures . . . in 196 different statutes')."

[33] Some procedural concerns arising in this case are discussed *post,* pages 375-377.
 As to the standard of review, see *post,* footnote 36.

### (iii) Conclusion

As observed above, there is no modern decision of this state addressing the precise administrative remedial power challenged here. With the exception of *Jersey Maid*—which, for the reasons discussed above, we do not believe should be viewed as controlling—our prior cases do not conflict with the approach taken by our sister states, and indeed they recognize the constitutional necessity of the "principle of check." We believe our sister states' approach (i.e., embracing substantive as well as procedural limitations on administrative power) reflects a practical and reasoned understanding of the judicial powers doctrine. With the following considerations and concerns in mind, we, like our sister states, conclude that administrative adjudication and awarding of restitution does not offend our Constitution's judicial powers clause when these substantive and procedural limitations are respected.

We too will carefully apply the "reasonable necessity/legitimate regulatory purpose" requirements in order to guard against unjustified delegation of authority to decide disputes that otherwise belong in the courts.[34] Specifically, we will inquire whether the challenged remedial power is authorized by legislation,[35] and reasonably necessary to accomplish the administrative agency's regulatory purposes. Furthermore, we will closely scrutinize the agency's asserted regulatory purposes in order to ascertain whether the challenged remedial power is merely incidental to a proper, primary regulatory purpose, or whether it is in reality an attempt to transfer determination of traditional common law claims from the courts to a specialized agency whose primary purpose is the processing of such claims. Thus, for example, we would not approve the Board's adjudication of a landlord's common law counterclaims (extraneous to the Board's regulatory functions) against a tenant. Such adjudication would (i) not reasonably effectuate the Board's regulatory purposes—ensuring enforcement of rent levels—and (ii) it would shift the Board's primary purpose from one of ensuring the enforcement of

---

[34] See *In re Opinion of the Justices, supra,* 179 A. 244, 345-347, quoted *ante,* page 366; Jaffe, *supra,* Judicial Control of Administrative Action, page 97.

[35] Licensing agencies, for example, typically possess implied legislative authorization to [i]mpose restitution as a condition of probation on a disciplined licensee. (See, e.g., *Russell v. Miller, supra,* 21 Cal.2d 817, 818 (restitution by electrical contractor), and Bus. & Prof. Code, § 7095 (board may "[i]mpose on the licensee compliance with such specific conditions as may be just in connection with his operations as a contractor . . . and may further provide that until such conditions are complied with no application for restoration of the suspended . . . license shall be accepted by the registrar"); see also *American Funeral Concepts, supra,* 136 Cal.App.3d 303, 308 (restitution by funeral director), and Bus. & Prof. Code, § 7690, subds. (c), (d) & (f) (board may impose "[p]robation," "[s]uspension of the right to practice" and "[s]uch other penalties as the board deems fit"); see generally Gov. Code, § 11503 (providing for "[a] hearing to determine whether a . . . license . . . should be revoked, suspended, *limited or conditioned*").)

rent levels, to adjudicating a broad range of landlord-tenant disputes traditionally resolved in the courts. Finally, we will continue to apply the "principle of check" in order to reserve to the courts the "true" judicial power.[36]

### d. *Application of the limiting principles to the facts of this case*

#### (i) *The "reasonable necessity/legitimate regulatory purpose" requirement*

■ As noted above, the Board held hearings, heard testimony, and determined that plaintiff charged excess rents of $1,068 to tenant Plevka, and $600.50 to tenant Smith.[37] We conclude that such actions, although judicial in nature, are both authorized by the Charter Amendment and reasonably necessary to accomplish the administrative agency's primary, legitimate regulatory purposes, i.e., setting and regulating maximum rents in the local housing market. The Board's legitimate regulatory authority, and hence its incidental remedial authority, is circumscribed. It may not, and does not, hear and adjudicate all manner of disputes between landlords and tenants. Its authority is derived from the local police powers (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 655 [209 Cal.Rptr. 682, 693 P.2d 261]; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 140-142 [130 Cal.Rptr. 465, 550 P.2d 1001]), and extends only so far as necessary to set and regulate rents. Incidental to that legitimate primary purpose—and "in order to produce an efficient and effective administrative enforcement of the public interest" (*Opinion of the Justices, supra,* 179 A. 344, 346), the Board may review the rents actually charged, and order necessary adjustments to assure compliance with its price control regulations.

The trial court erred therefore in concluding that the Board exercised judicial powers in violation of the Constitution by adjudicating (subject to judicial review) tenants' claims for excess rents, and ordering restitution of the excess amounts.[38] We conclude, however, that the administrative orders in this case violated the "principle of check."

---

[36] In this regard we observe that in cases such as this—in which a private party has a "direct pecuniary interest" in the administrative agency's determination—the independent-judgment test may be the appropriate standard for a court to apply in reviewing the administrative determination. (See *County of Alameda* v. *Board of Retirement* (1988) 46 Cal.3d 902, 908-909 [251 Cal.Rptr. 267, 760 P.2d 464]; *Interstate Brands* v. *Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 781 [163 Cal.Rptr. 619, 608 P.2d 707].)

[37] Also as noted above, the Board found and assessed interest on those amounts of $97.91 and $51.58, respectively.

[38] We are not called on to decide whether an administrative agency's award of general compensatory damages would violate the judicial powers clause and we express no opinion on the issue.

### (ii) *The "principle of check"*

■ The Board authorized tenant Plevka to "withhold[ ] his entire month's rent in the first month following the Board's decision . . . and the remaining monies in the months thereafter. The withheld amounts shall not form the basis for an unlawful detainer proceeding based upon nonpayment of rent."[39] Plaintiff asserts that by allowing such withholding, and by setting up the Board's decision as a defense to any unlawful detainer action based on nonpayment of rent, the Board in practical effect issued a self-enforceable judgment, thereby violating the judicial powers clause.[40]

Plaintiff's concern is significant. Under present procedures, the Board possesses the ability to make an order that, although not "final" or "self-enforcing" in the typical sense of those terms, is in fact immediately enforceable in a real sense at the discretion of a private party. By its own regulations, the Board's decision becomes final "at the time of Board action," i.e., immediately after the Board renders its decision. Thereafter a tenant may withhold rent up to the amount specified by the Board. In this fashion the Board's order is given immediate practical effect: before the landlord has even the opportunity to obtain judicial review by petition for writ of mandate[41] (Code Civ. Proc., § 1094.5, subd. (a)) and a stay of the Board's order (*id.*, subd. (g)), the tenant is allowed to withhold rent money otherwise due. In addition, the Board's order is also thereby given legal effect: the order, pursuant to the Charter Amendment, is an affirmative defense to an unlawful detainer action based on the tenant's nonpayment of rent. (*Fisher, supra,* 37 Cal.3d 644, 705-707.)

Although the trial court eventually issued temporary stays limiting somewhat the Board's orders in this case,[42] the "principle of check" was not

---

[39] Because Smith was no longer a tenant, the Board ordered simply that "Complainant Smith is entitled to total damages" of a specified amount.

[40] Defendant responds that we have previously affirmed the constitutionality of rent withholding. (*Fisher, supra,* 37 Cal.3d 644.) *Fisher,* however, did not address the issue posed here. In *Fisher* we rejected broad due process and preemption challenges to rent withholding provisions similar to those here, but the parties did not raise, nor did we address, the relevance of the judicial powers clause. (*Id.* at pp. 699-709.)

[41] See Charter Amendment section 1808 (Board's decision is "appeal[able] to the appropriate court within the jurisdiction").

[42] The Board's decision was made in late March 1983. Thereafter Plevka withheld his rents for April, May, and June. In late June plaintiff sought review by a writ of mandate (Code Civ. Proc., § 1094.5, subd. (a)), and a stay (*id.*, subd. (g)), from the superior court. On plaintiff's motion, the court granted an order to show cause and temporary stay of the Board's order. The court's order required the Board to show cause why it should not "stay operation" of the Board's administrative decision (pending entry of judgment of the court in this action) as follows: "A. . . . [Tenant] Smith, shall take no action to enforce the . . . Board's decision declaring that she is entitled to recover from [plaintiff] the sum of . . . $1,593.08 pending the entry of the judgment of the court in this action; and

respected here. Before there was an opportunity for the court to pass on whether to stay temporarily the Board's rent withholding order, tenant Plevka immediately withheld rent, and continued to do so for three months thereafter. Moreover, during that time, any unlawful detainer action based on Plevka's nonpayment of rent would have been met with the defense that the Board's order authorized such nonpayment—thereby giving the Board's order legal effect.[43]

An administrative order of this nature is unlike any other of which we are aware. And, in our view, for the reasons set out above it represents an unwarranted intrusion into the power of the courts to "check" administrative adjudications. We thus conclude that the rent withholding order in this case violated the judicial powers provision of our Constitution (art. VI, § 1).[44]

Having reached this determination, we agree with the trial court insofar as it found the administrative orders in this case violated the judicial powers clause. The court erred, however, insofar as it held that Board adjudication of excess rent claims under section 1809 of the Charter Amendment in and of itself violates the judicial powers clause, and enjoined future adjudication under that provision.

---

"B. . . . [Tenant] Plevka shall pay rent in the sum of . . . $470.00 per month, retroactive to April 1, 1983, on the first day of each month into the trust account of [plaintiff's law firm] . . . pending entry of judgment in this case. Payments for April, May, June and July, 1983, shall be made on or before August 1, 1983. Said funds shall only be disbursed by said law firm as directed by order of the court or by stipulation of the parties."

Additionally, the court ordered the Board to stay operation of its administrative decision, "on the terms and conditions set forth in subparagraphs 'A' and 'B' above, pending the hearing of this order to show cause."

A month later, on defendant's motion, the court modified its temporary stay order. The new order retained provision "A," but additionally required plaintiff to place in her attorney's trust account, in three monthly installments, the $1,593.08 declared by the Board to be owed to Smith. It also modified provision "B," absolving tenant Plevka of responsibility to place in trust the withheld rents of April, May, and June, and ordering instead that he begin in July to place rents in the trust account.

[43] Similarly, tenant Smith was free to take legal action to enforce the Board's award as to her.

[44] Our holding is limited by the facts of this case: we consider only the propriety of an administrative order requiring immediate payment of money or authorizing immediate withholding of money that would otherwise be owed. We do not address other types of administrative orders having immediate effect, including immediately effective restitutive orders issued by professional licensing boards.

The Board may avoid the constitutional problem outlined above by (as a matter of regular procedure) staying enforcement of its orders for a period of time sufficient to allow an aggrieved party to seek from the courts a stay of the Board's order under Code of Civil Procedure section 1094.5, subdivision (g). (Cf., Gov. Code, § 11519, subd. (a) ["The decision shall become effective 30 days after it is delivered or mailed to respondent unless . . . a stay of execution is granted."].)

## 2. *The power to award "treble" damages*

■ In addition to the "restitutive" excess rent amounts, the Board assessed treble damages against portions of both tenants' excess rents. Tenant Plevka was awarded an extra $1,632, and tenant Smith was awarded an extra $941.

We emphasize at the outset the limited question posed here. We do not consider the constitutional propriety of administrative imposition of penalties,[45] nor do we consider the propriety of relatively minor "punitive damages" under statutory schemes that expressly authorize such damages, and set a cap on such awards.[46] We consider only the authority of the rent control board to impose *treble damages.*[47]

Applying the "substantive limitations" prong of the test set out *ante,* page 372, we conclude treble damages, although authorized by the Charter Amendment, may not constitutionally be imposed by the Board. First, we note that administrative agencies regularly exercise a range of powers de-

[45] A number of pollution control statutes authorize such penalties. (See, e.g., Health & Saf. Code, § 25189.2, subd. (e); Wat. Code, §§ 13261, subds. (b) & (d), 13265, subds. (b) & (d), 13268, subds. (b) & (d), 13350, subds. (d), (e) & (f); Food & Agr. Code, § 12999.5, subd. (a).) We note that our sister states have approved in principle the authority of administrative agencies to impose money penalties as a reasonable means of enforcing administrative regulations. (See *City of Waukegan, supra,* 311 N.E.2d 146, 152-153; *Appalachian Power Co.* v. *Public Service Com'n* (W.Va. 1982) 296 S.E.2d 887, 891; *Wycoff Company* v. *Public Service Commission* (1962) 13 Utah 2d 123 [369 P.2d 283, 285]; see also *Rosenthal* v. *Hartnett* (1975) 36 N.Y.2d 269 [367 N.Y.S.2d 247, 326 N.E.2d 811, 814].) In addition, a number of federal cases have reached similar conclusions under the federal Constitution. (E.g., *Atlas Roofing Co., supra,* 430 U.S. 442, 454-455 [51 L.Ed.2d 464, 475]; *Helvering* v. *Mitchell* (1938) 303 U.S. 391 [82 L.Ed. 917, 58 S.Ct. 630] [tax penalty]; *Lloyd Sabaudo Societa* v. *Etling* (1932) 287 U.S. 329 [77 L.Ed. 341, 53 S.Ct. 167] [fine imposed on steamship company for violating immigration laws].)

[46] At least one statute provides for "punitive damages" of up to $1,000 to be awarded by the FEHC in housing discrimination matters. (Gov. Code, § 12987, subd. (2).) In *Hess* v. *Fair Employment & Housing Com., supra,* 138 Cal.App.3d 232, the Court of Appeal construed that statute and upheld an award of "punitive" damages in a housing discrimination case. The parties, however, did not raise, nor did the court address, the constitutional propriety of such an award. (See *Rody* v. *Hollis* (1972) 81 Wn.2d 88 [500 P.2d 97, 99-100] [approving, against a "judicial powers" challenge, imposition of administrative penalty made payable to a private complainant].)

[47] As we observed, *ante,* footnote 4, effective January 1, 1987, "penalties and sanctions" may not be imposed against a landlord who is in "substantial compliance" with a rent control ordinance. (Civ. Code, 1947.7, subd. (b).) In such a case, restitution or recovery of filing fees "shall be the exclusive remedies." (*Ibid.*)

Although defendant cites no other administrative scheme in which treble damages are allowed, we have discovered one such scheme in the rent control law of the District of Columbia. In *Mudd* v. *D.C. Rental Housing Com'n* (D.C.App. 1988) 546 A.2d 440, 442-443, the court upheld, against due process challenges, imposition of treble damages. *Mudd,* however, did not address the judicial powers questions in issue here.

signed to induce compliance with their regulatory authority (e.g., imposition of fines or penalties, awards of costs and attorney fees), and there is no reason to believe that such options would be insufficient here. (Indeed, we observe that after the award in this case, the Charter Amendment was revised to delete the Board's power to award such damages—see *ante,* footnote 2.) Most significantly, however, we believe that the power to award treble damages in the present context poses a risk of producing arbitrary, disproportionate results that magnify, beyond acceptable risks, the possibility of arbitrariness inherent in any scheme of administrative adjudication.[48]

Accordingly, we agree with the trial court insofar as it held imposition of treble damages under former section 1809, subdivision (b) of the Charter Amendment violates the judicial powers clause, and enjoined future imposition of treble damages under that provision.[49]

### 3. *Right to a jury trial*

 Plaintiff interveners assert that administrative adjudication of monetary relief claims violates the state constitutional right to jury trial (Cal. Const., art. I, § 16). They reason that such relief is available only in a court action at which, under the common law, a party has a right to a jury trial. Because we uphold the Board's authority to adjudicate "restitutive" excess rent claims, we also address plaintiff interveners' jury trial contention.

Our Constitution states: "Trial by jury is an inviolate right and shall be secured to all . . . ." We have long observed, "It is the right to trial by jury as it existed at common law which is preserved [by article I, section 16]." (*People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 286-287 [231 P.2d 832].) We have not, however, previously considered the application of this provision to administrative adjudication.

 When deciding whether a jury trial is required for a matter prosecuted *in court* we look to the "gist of the action." If the "gist" is legal, as

---

[48] Cf., 2 Areeda & Turner, Antitrust Law (1978) ¶ 331b2, page 150, discussing policy reasons against private actions for treble damages under the federal antitrust laws: "[T]he common law's usual discomfort with imposing unforeseen liability is greatly exacerbated when compensatory damages are automatically trebled. A defendant might reasonably suppose that he is complying with the antitrust laws, only to discover that he was mistaken initially or that the law has changed in the meantime. . . ." In the same vein, see Comment, *Antitrust Enforcement by Private Parties*: *Analysis of Developments in the Treble Damage Suit* (1952) 61 Yale L.J. 1010, 1062 ("private suits may create windfalls, for triple damage awards . . . shape recoveries in excess of actual loss").

[49] Having reached this conclusion we need not address plaintiff's assertion that *Grossblatt* v. *Wright* (1951) 108 Cal.App.2d 475 [239 P.2d 19], precludes the award of treble damages in this case. We note, however, that *Grossblatt* concerned judicial, not administrative, adjudication, and thus is not on point. (See *post,* fn. 50.)

opposed to equitable, we have recognized a right to jury trial. (See, e.g., 37 Cal.2d at p. 299; 7 Witkin, Cal. Procedure (3d ed. 1985) §§ 87-96, pp. 87-97, and cases cited.)[50] That approach, however, does not resolve plaintiff interveners' claim that adjudication of a dispute between private parties in an administrative forum is impermissible because a jury trial is unavailable.[51] Interveners apparently concede the inapplicability of the "gist" test to the present jury trial claim.

A number of our sister states have addressed state constitutional jury trial challenges to similar administrative schemes.[52] These decisions, which involve money awards by "antidiscrimination" commissions (*Fraser, supra,* 625 S.W.2d 852, 854; *Plasti-Line, supra,* 746 S.W.2d 691, 693-694; *General Drivers & Helpers, supra,* 124 N.W.2d 123, 128; *Pearlman, supra,* 239 S.E.2d 145, 147-148; *Williams* v. *Joyce, supra,* 479 P.2d 513, 522-523), and by a "landlord-tenant" board (*Investors, supra,* 312 A.2d 225, 243, fn. 12), unanimously hold that no jury trial right exists as to adjudication of a matter otherwise properly within the regulatory power of an administrative agency.

Our sister courts have emphasized aspects of the federal courts' "public rights" concept (discussed *post,* pp. 381-385) as well as other concerns, such as the existence of the action at common law, and the nexus between the challenged power and the agency's regulatory purpose. Read together with their discussions of the judicial powers issue, we adduce from these decisions the following proposition: Once a court has determined that exercise of a challenged administrative power meets the "substantive limitations" requirement imposed by the state constitution's judicial powers doctrine—i.e., the challenged activities are authorized by statute or legislation, and are reasonably necessary to, and primarily directed at, effectuating the administrative agency's primary, legitimate regulatory purposes—then the state constitution's jury trial provision does not operate to preclude administrative adjudication. Neither plaintiff, nor the amicus curiae and interveners appearing on her behalf, offer a compelling reason to reach a different conclusion under our own constitutional provision.

---

[50] Applying that standard in a court action for treble damages under a 1947 federal rent control statute, the court in *Grossblatt, supra,* 108 Cal.App.2d 475, 484-486, concluded the action was tantamount to a common law action for debt, for which the common law recognized a jury trial as a matter of right.

[51] See, e.g., *Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 464-465 [150 Cal.Rptr. 495] (no right to jury trial in Agricultural Labor Relations Board proceedings because (i) the Constitution expressly authorizes administrative adjudication, and (ii) the statutory proceeding at issue was "unknown at common law").

[52] The language of the jury trial provisions of these states is substantively similar to article I section 16 of the California Constitution. (See Ky. Const., § 7; Tenn. Const., art. 1, § 6; Wis. Const., art. 1, § 5; W.Va. Const., art. 3, § 13; Ore. Const., art. I, § 17; Md. Const., art. 5.)

We agree with the approach of our sister states. Having previously determined that the Board's adjudication of excess rents meets the substantive-limitations requirement imposed by our judicial powers clause (*ante*, p. 372), we further conclude that such adjudication is not precluded by article I, section 16.[53]

Without addressing the merits of the other states' approach to the jury trial issue, plaintiff interveners propose a different analysis. They offer neither support for their proposed test, nor any compelling reason why our jury trial provision should be construed to preclude administrative adjudication of issues within the scope of an agency's regulatory authority. In any event, we conclude that even under the novel test proposed, plaintiff interveners have shown no violation of the right to jury trial in these circumstances.

■■■ Plaintiff interveners suggest there is or should be a state constitutional right to jury trial if (i) the administrative body is "nonconstitutional" (see *ante*, pp. 355-356), (ii) the rights involved are "private" rather than "public," and (iii) the "private" right is grounded in the common law. Their argument fails under the second prong of their test because, according to the very cases on which plaintiff interveners rely, the interests at issue here would be deemed "public" rights properly adjudicable by an administrative agency without a jury.

■■■■ The "public" versus "private" rights distinction is drawn not from California jurisprudence, but from the federal cases addressing similar issues under, inter alia, the Seventh Amendment of the federal Constitution.[54] That provision states: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of jury trial shall be preserved . . . ."

■■■ Under federal law, the right to jury trial does not attach to the administrative adjudication of "public rights." (*Atlas Roofing, supra,* 430 U.S. 442, 455, 460 [51 L.Ed.2d 464, 475, 478].) Behind the "public rights" doctrine lies the idea that when a legislative body acts by statute to promote

---

[53] Resolution of the question might be different in a situation in which an agency purports to adjudicate substantial "damage" claims such that recovery of damages becomes the primary focus, as opposed to merely an incidental aspect of the regulatory scheme. (See, e.g., *Zahorian, supra,* 301 A.2d 754, 761-762, quoted *ante*, fn. 31.)

[54] Although the Seventh Amendment applies only to actions in the federal courts (see *Crouchman* v. *Superior Court* (1988) 45 Cal.3d 1167, 1173, fn. 5 [248 Cal.Rptr. 626, 755 P.2d 1075], and cases cited), the high court's interpretation of that amendment is relevant in the present context. Like the state constitutional provision, the Seventh Amendment merely "preserves" the common law right to jury trial and does not create a new or broader right. Thus, under both provisions, the ultimate question is whether the constitutional guaranty "provide[s] an impenetrable barrier to administrative factfinding under otherwise valid . . . regulatory statutes." (*Atlas Roofing, supra,* 430 U.S. 442, 460 [51 L.Ed.2d 464, 478].)

the general welfare, it is not precluded from establishing administrative enforcement of its statutory scheme—even if some incidental "private" interests (e.g., a money judgment made payable by one private party to another) are thereby affected. Contrary to plaintiff interveners' position, it is quite clear that the rent control matters involved here fall within the traditional scope of the federal "public rights" doctrine. A line of high court cases demonstrates that point.

In *Block* v. *Hirsh* (1921) 256 U.S. 135 [65 L.Ed. 865, 41 S.Ct. 458, 16 A.L.R. 165], the court rejected a jury trial challenge to a federal rent control statute, under which rents were regulated and tenants were permitted to hold over despite expiration of their leases. Writing for the court, Justice Holmes upheld the administrative board's authority to regulate rents as a reasonable exercise of police power to address a matter of "public interest." (*Id*. at pp. 153-158 [65 L.Ed. at pp. 869-872].) The court also rejected the landlord's jury trial claim: "The statute is objected to on the further ground that landlords and tenants are deprived by it of a trial by jury on the right to possession of the land. If the power of the commission established by the statute to regulate the relation is established, as we think it is, by what we have said, this objection amounts to little. To regulate the relation and to decide the facts affecting it are hardly separable." (*Id*. at p. 158 [65 L.Ed. at p. 872].)

Similarly, in *Labor Board* v. *Jones & Laughlin* (1937) 301 U.S. 1 [81 L.Ed. 893, 57 S.Ct. 615, 108 A.L.R. 1352], the court held the Seventh Amendment does not apply in an administrative action before the National Labor Relations Board involving an employee's backpay claim against his employer. The court rejected the employer's assertion that the Board's award of backpay "is equivalent to a money judgment and hence contravenes the Seventh Amendment with respect to trial by jury." (*Id*. at p. 48 [81 L.Ed. at p. 918].) The court responded: "The Amendment . . . has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law. [Citations.] It does not apply where the proceeding is not in the nature of a suit to the common law. [Citation.] [¶] The instant case is not a suit to the common law or in the nature of such a suit. The proceeding is one unknown at common law. It is a statutory proceeding. Reinstatement of the employee and payment for time lost are requirements [administratively] imposed for violation of the statute and are remedies appropriate to its enforcement. The contention under the Seventh Amendment is without merit." (*Id*. at pp. 48-49 [81 L.Ed. at p. 918].)

Subsequently, in *Pernell* v. *Southall Realty* (1974) 416 U.S. 363 [40 L.Ed.2d 198, 94 S.Ct. 1723], the high court considered a tenant's jury trial claim in a *court* action by a landlord to recover possession of real property.

The court concluded that because a statute directed that such matters be heard in court—rather than before an administrative agency—and because repossession actions in court were triable by jury at common law, the right to jury trial was preserved under the statute at issue. (*Id*. at p. 383 [40 L.Ed.2d at p. 213].) The court made it clear, however, that the legislature could have established a nonjury trial scheme if it had deemed it appropriate to relegate adjudication of such disputes to an administrative agency. Referring to *Block* v. *Hirsh, supra,* 256 U.S. 135, the court stated that decision "stands for the principle that *the Seventh Amendment is generally inapplicable in administrative proceedings,* where jury trials would be incompatible with the whole concept of administrative adjudication. See . . . *Jones & Laughlin* [, *supra,* 301 U.S. 1]. *We may assume that the Seventh Amendment would not be a bar to a congressional effort to entrust landlord-tenant disputes, including those over the right to possession, to an administrative agency.* . . ." (416 U.S. at p. 383 [40 L.Ed.2d at p. 213], italics added.)

Thereafter, in *Atlas Roofing, supra,* 430 U.S. 442, the high court considered, against a Seventh Amendment claim, the propriety of an administrative award of $5,000 as a penalty for violation of federal work-safety standards under the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.). The defendants argued that because a court action to collect civil penalties is essentially a "suit for a money judgment which is classically a suit at common law" and for which they would be entitled to a jury if tried in court, then when faced with the same money penalties in an administrative forum, they enjoyed the same right to jury trial.

The court rejected this argument. Quoting the above cited passages of *Block* v. *Hirsh, supra,* 256 U.S. 135, *Jones & Laughlin, supra,* 301 U.S. 1, and *Pernell, supra,* 416 U.S. 363, the court explained: "[T]he cases discussed above stand clearly for the proposition that when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.' Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field. This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a federal court of law instead of an administrative agency." (*Atlas Roofing, supra,* 430 U.S. at p. 455 [51 L.Ed.2d at p. 475], fn. omitted.)[55]

---

[55]The court gleaned additional guidance from its earlier cases discussing the propriety of administrative fines and penalties (see cases cited *ante,* fn. 45), and observed that although those cases did not specifically discuss the jury trial claim, "[i]t is difficult to believe that these

The *Atlas Roofing* court next rejected the assertion that allowing administrative adjudication of certain disputes would permit Congress to "destroy the right to a jury trial by always providing for administrative rather than judicial resolution of the vast range of cases that now arise in courts." (430 U.S. at p. 457 [51 L.Ed.2d at p. 477].) The court responded: "Our prior cases support administrative factfinding in only those situations involving 'public rights,' e.g., where the Government is involved in its sovereign capacity[56] under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated." (*Id.* at p. 458 [51 L.Ed.2d at p. 477].)

The court then reviewed the historical context of the federal jury trial provision (430 U.S. at pp. 458-460 [51 L.Ed.2d at pp. 477-478]), and summarized as follows: "The point is that the Seventh Amendment was never intended to establish the jury as the exclusive mechanism for factfinding in civil cases. It took the existing legal order as it found it, and there is little or no basis for concluding that the Amendment should now be interpreted to provide an impenetrable barrier to administrative factfinding under otherwise valid federal regulatory statutes. We cannot conclude that the Amendment rendered Congress powerless—when it concluded that remedies available in courts of law were inadequate to cope with a problem within Congress' power to regulate—to create new public rights and remedies by statute and commit their enforcement, if it chose, to a tribunal other than a court of law—such as an administrative agency—in which facts are not found by juries." (430 U.S. at p. 460 [51 L.Ed.2d at p. 478].)

Finally, the court concluded: "Thus, history and our cases support the proposition that the right to a jury trial turns *not solely on the nature of the issue to be resolved but also on the forum in which it is to be resolved.*" (430 U.S. at pp. 460-461 [51 L.Ed.2d at p. 479], italics added.) The court noted that under the statutory scheme at issue Congress had "created a new cause of action, and remedies therefor, unknown to the common law, and placed their enforcement in a tribunal supplying speedy and expert resolutions of the issues involved. The Seventh Amendment is no bar to the creation of new rights or to their enforcement outside the regular courts of law." (*Id.* at p. 461 [51 L.Ed.2d at p. 479].) The court thus affirmed the agency's power to issue abatement orders and impose civil money penalties.

---

holdings or dicta did not subsume the proposition that a jury trial was not required." (*Atlas Roofing, supra,* 430 U.S. at p. 456 [51 L.Ed.2d at p. 476].)

[56] In *Atlas Roofing* the government was the prosecuting party. Subsequently the court has made clear that its public rights doctrine does not require participation by the government as a party of record in the administrative litigation. (See *Thomas, supra,* 473 U.S. 568, 586, 589 [87 L.Ed.2d 409, 423, 425].)

Considering the court's statements in *Block* v. *Hirsh, supra,* 256 U.S. 135, *Jones & Laughlin, supra,* 301 U.S. 1, and *Pernell, supra,* 416 U.S. 363—and the characterization of those cases in *Atlas Roofing, supra,* 430 U.S. 442—it seems clear that the high court would view the matters at issue in this case (a claim of excess rent and adjudication thereof under the ordinance) as involving "public rights," and hence properly resolved by an administrative agency without a jury. Indeed, in a recent discussion of the public rights doctrine, the high court confirmed this view: "The Court has treated as a matter of 'public right' . . . an administrative proceeding to determine the rights of landlords and tenants. See *Atlas Roofing* [, *supra,* 430 U.S. at pp. 454-455], citing as an example of 'public rights' the federal land-lord/tenant law discussed in *Block* v. *Hirsh,* [*supra,* 256 U.S. 135] . . . ." (*Thomas, supra,* 473 U.S. 568, 588-589 [87 L.Ed.2d at p. 425].)

It is true, as plaintiff notes, that in the course of vindicating a general "public right" in the enforcement of maximum rents, the administrative proceedings challenged here also determine the rights of private individuals as they relate to those rents. Nonetheless, as the United States Supreme Court observed in *Thomas, supra,* 473 U.S. 568, the same is true of administrative schemes involved in the high court's cases (most notably the landlord-tenant scheme in *Block* v. *Hirsh, supra,* 256 U.S. 135), yet the court has never found exercise of administrative power improper on that ground.[57] The same can be said for plaintiff's assertion that because landlords do not submit voluntarily to administrative adjudication, such adjudication is outside the proper scope of agency power. Neither *Atlas Roofing, supra,* 430 U.S. 442, nor the earlier cases discussed *ante,* draw this distinction; in fact they disclose that submission to the administrative agency was involuntary. (*Block* v. *Hirsh, supra,* 256 U.S. 135, 158 [65 L.Ed. 865, 872]; *James & McLaughlin, supra,* 301 U.S. 1, 25, 48-49 [81 L.Ed. 893, 905, 918].)[58]

[57] After noting that it had previously characterized the landlord-tenant scheme involved in *Block* v. *Hirsh, supra,* 256 U.S. 135, as involving "public rights," the court observed that such "proceedings surely determine liabilities of individuals," and yet they would be "beyond the power of Congress" under a restrictive interpretation of the public rights doctrine. (*Thomas, supra,* 473 U.S. at p. 589 [87 L.Ed.2d at p. 425].)

[58] We recognize that in *CFTC, supra,* 478 U.S. 833, 848-850 [92 L.Ed.2d 675, 690-692], the high court recently discussed voluntary participation in administrative adjudication as a factor to be considered when deciding whether a matter may be resolved in a nonjudicial forum consistently with the federal judicial powers clause (U.S. Const., art. III, § 1). *CFTC,* however, is distinguishable. It involved the power of an administrative agency to resolve, in the course of an administrative reparations proceeding between a commodity futures customer and his broker, the broker's *common law counterclaim.* The power of the agency to adjudicate the underlying reparations claim was unchallenged. (*Id.* at p. 854 [92 L.Ed.2d at p. 695].) The counterclaim raised purely "private" common law disputes "of the kind assumed to be at the 'core' of matters normally reserved to Article III courts." (*Id.* at p. 853 [92 L.Ed.2d at p. 694].)

The high court upheld the agency's power to adjudicate the counterclaim. The opinion concluded that exercise of such power does not violate the "structural interests" that inform

In summary, we conclude that when, as here, a rent control board's adjudication of excess rent meets the substantive-limitations requirement imposed by our judicial powers clause, the Constitution's jury trial provision does not operate to preclude administrative adjudication. We do not adopt plaintiff interveners' suggested test incorporating the high court's "public rights" doctrine. We observe, however, that even under that approach, plaintiff was not entitled to a jury trial under article I, section 16 of the California Constitution.

## III. *Disposition*

For the reasons discussed above, we conclude former section 1809 is not constitutionally infirm except insofar as it authorizes the Board to award treble damages and permits orders awarding restitution to become effective before there is an opportunity for the court to pass on whether to stay the challenged order pending review of the administrative decision by writ of mandate.

The judgment is reversed with directions to recall and/or set aside the peremptory writ of mandate issued by the court on November 15, 1983, to issue a new and different writ commanding the Board to reduce its awards in conformity with this decision, to stay enforcement of any future order in accordance with this decision (see *ante,* fn. 44), to deny the petition for writ of mandate in all other respects, and to deny the motions of plaintiff and interveners for summary judgment.

Mosk, J., Eagleson, J., Kaufman, J., and Arguelles, J.,* concurred.

**PANELLI, J.**—I concur fully in the judgment and its underlying reasoning. I write separately to emphasize that we do not in this case decide the validity of an administrative scheme that, in the guise of advancing "public" rights or the general welfare, permits an agency to award substantial general compensatory damages to an aggrieved individual on grounds such dam-

the judicial powers clause. (478 U.S. at pp. 850-857 [92 L.Ed.2d at pp. 692-697].) It suggested, however, that had the parties not consented to agency adjudication of the counterclaim, resolution of that matter would have violated the customer's "personal right" under article III, section 1 to a judicial determination of the broker's counterclaim. (*Id.* at pp. 848-857 [92 L.Ed.2d at pp. 690-697]; see also *Coit Independence Joint Venture* v. *Federal Savings & Loan Insurance Corp.* (1989) 489 U.S. __, __ [103 L.Ed.2d 602, 618, 109 S.Ct. 1361, 1371] [usury and breach of fiduciary duty claims under state law involved " 'private rights' which are at the 'core' of 'matters normally reserved to article III courts' "; allowing administrative agency to resolve such suits would "raise[ ] serious constitutional difficulties"] [dictum].) Had the *CFTC* case presented the agency's authority to adjudicate only the reparations claim, it appears that the parties' consent to the administrative forum would have been of little or no significance. (See *CFTC, supra,* 478 U.S. at pp. 854-855 [92 L.Ed.2d at p. 695].)

 * Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

ages further the agency's regulatory purposes, or are merely "incidental" to other equitable or restitutive relief.

In *Labor Board* v. *Jones & Laughlin* (1937) 301 U.S. 1 [81 L.Ed. 893, 57 S.Ct. 615, 108 A.L.R. 1352], cited by the majority (*ante,* at p. 382), the high court rejected an employer's Seventh Amendment jury trial challenge to the administrative award of backpay. The court stated, "The Amendment . . . has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law." (301 U.S. at p. 48 [81 L.Ed. at p. 918].) However, the damages at issue—backpay—were restitutive and quantifiable, analogous to special damages in an action at law. In context, therefore, the high court's statement cannot be read as upholding the administrative award of general compensatory damages.

In determining the application of our constitutional jury trial provision (Cal. Const., art. I, § 16) to the administrative award of damages, the majority adopts the substantive-limitations test earlier applied in the context of the judicial powers doctrine. Pursuant to that test, if the challenged activities (i.e., the remedy or damages award) "are authorized by statute or legislation, and are reasonably necessary to, and primarily directed at, effectuating the administrative agency's primary, legitimate regulatory purposes—then the state constitution's jury trial provision does not operate to preclude administrative adjudication." (*Ante,* at p. 380.)

As in *Jones, supra,* the damages at issue in the instant case—excess rent—are restitutive in kind and limited in amount. Resolution of the jury trial issue, as the majority suggests, "might be different in a situation in which an agency purports to adjudicate substantial 'damage' claims such that recovery of damages becomes the primary focus, as opposed to merely an incidental aspect of the regulatory scheme." (*Ante,* at p. 381, fn. 53.)

Although the award of general compensatory damages may have substantive effect, in that it deters violation of the regulatory scheme, and thus arguably may meet the substantive-limitations requirement, when the damages awarded advance a substantial private interest in remuneration that is disproportionate to the concept of public relief, the right to jury trial is implicated and a jury is required. Regardless of the substantive effect of a general damages award in effectuating an agency's legitimate regulatory purposes, an administrative hearing cannot, consistent with the right to trial by jury, be transformed into a forum for adjudicating general damages. Neither the substantive-limitations test, nor our opinion, should be understood as sanctioning an administrative award of unlimited general compensatory damages.

Eagleson, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting.—I agree that it is not a violation of the separation of powers doctrine to authorize an administrative agency to adjudicate claims between individuals when this power is reasonably necessary to effectuate the agency's legitimate regulatory purpose, and when the essential judicial power remains in the courts by way of judicial review of agency determinations. (See maj. opn., *ante,* at p. 372.)

I do not agree that the portion of the Santa Monica Rent Control Ordinance, which permits the rent control board (Board) to order a landlord who has overcharged to pay damages of three times the overcharge, violates this standard. Nor do I agree that a Board order that is effective immediately so inhibits effective judicial review as to make the order unconstitutional.

### 1. *Treble Damages.*

The majority distort the scope of judicial review of legislative enactments and ignore the rationale for their own standard in rejecting the treble damage element of the ordinance. They do not question the general power of administrative agencies to impose penalties. They cannot; their own citations demonstrate that the matter is settled at the state and federal levels, and that many of our own state regulations provide for administrative penalties. (See maj. opn., *ante,* at p. 378, fn. 45.) They conclude, too, that "restitutive" compensatory damages are appropriate in the rent control context. Nonetheless they reject the former provision of the Santa Monica ordinance which provided that the Board may order a landlord who has overcharged on rents to pay the tenant "three (3) times the amount by which the payment . . . received or retained exceeds the maximum lawful rent." (Santa Monica City Charter, art. XVIII, § 1809(a).) They offer two explanations. The first is that other methods such as "imposition of fines or penalties, awards of costs and attorney fees" could be used to induce compliance with the rent control ordinance, and there is no reason to think these would be insufficient. (Maj. opn., *ante,* at p. 378.) Second, they worry that the authority to award treble damages will encourage arbitrary and "disproportionate" results. (*Ibid.*)

The translation for these objections is that the majority do not like treble damages, think other methods of enforcement would work, and think that a treble damage award is too high for the sin being punished. These are proper considerations for legislating, not judging. Our job is to determine whether the provision is constitutional, not if it is a good idea. The provision is constitutional if it is reasonably necessary to the administrative body's proper regulatory purpose, and if there is judicial review. It is and there is. That should be the end of the matter.

We start with the premise that legislative action is reasonable and constitutional. " '[A]ll presumptions and intendments favor the validity of a

statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.' [Citations omitted.] If the validity of the measure is 'fairly debatable,' it must be sustained. [Citations omitted.]" (*Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 814-815 [258 Cal.Rptr. 161, 771 P.2d 1247].) The presumption of constitutionality applies to municipal ordinances. (*City of Industry* v. *Willey* (1970) 11 Cal.App.3d 658 [89 Cal.Rptr. 922].) A heavy burden of proof is assumed by the party challenging the constitutionality of a measure. (2A Sutherland, Statutory Construction (4th ed. 1989 cum. supp.) § 45.11, p. 7.)

The majority fail to abide by these principles of judicial deference to legislative policymaking. We do not sit to determine the wisdom of legislation or the political worthiness of legislative goals or action. (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d 805, 814.) If we follow the majority's lead in this case, we will put ourselves in the business of deciding whether the thousands of administrative regulations that bind up modern commercial activity are a good idea, and whether enforcement mechanisms cause businesses to incur "disproportionate" costs. This judicial encroachment on the legislative sphere will be a violation of the doctrine of separation of powers; what the Santa Monica ordinance authorized is not.

As the majority and the authorities they rely on explain, the reason we require that administrative adjudication be reasonably necessary to a legitimate administrative purpose is to avoid relegating purely private disputes, the traditional core of common law actions, to administrative resolution. (See maj. opn., *ante,* at pp. 366, 368, 372, 374.) A treble damage award for violating administrative regulations does not endanger judicial hegemony over traditional common law actions.

The treble damage award here is a penalty against the landlord for failing to comply with the ordinance. It is obviously not compensatory, but punitive. The tenant is compensated for the rent overcharge when the Board orders the payment of damages in the amount of the rent overcharge. The portion of the ordinance providing for an award of an additional $500, or three times the overcharge, whichever is greater, is clearly punitive and designed to enhance enforcement.

A penalty against an individual for violating a legitimate state regulation is completely unlike a traditional common law action between individuals. It is inextricably intertwined with the essential regulatory purpose of the Board—to set and enforce stabilized rents. The fact that it is payable to an individual rather than the state does nothing to detract from its essentially regulatory purpose. If we conclude that "restitutive" compensatory damages to remedy *individual* harm are necessary to the fulfillment of the

legitimate regulatory purpose of an administrative agency, punitive damages for violation of the regulatory scheme must be conceded to be reasonably necessary. We may not like the penalty, we may regard it as harsh, but its imposition does not invade the judicial province of adjudicating private disputes between individuals.

The majority are concerned that the power to award treble damages makes the risk of arbitrariness "inherent in any scheme of administrative adjudication" too high. (See maj. opn., *ante,* at p. 379.) There is a short answer to this concern: judicial review. Any arbitrariness in awarding treble damages is just as susceptible of correction by way of judicial review as arbitrariness in awarding "restitutive" compensatory damages.

2. *Effective Date of Order.*

The ordinance provides that a tenant "may deduct the penalty from future rent payments in the manner provided by the Board." A Board regulation provided that its orders were final immediately. In this action, the Board authorized one tenant to withhold rent in the first month following the Board's decision, and for additional months, and provided that the withholding should not be the basis for an unlawful detainer proceeding based on nonpayment of rent. The majority conclude that the order is unconstitutional because it was immediately enforceable at the "discretion of a private party."

The majority complain that the tenant could withhold rent and resist an unlawful detainer action before the landlord had an opportunity to obtain judicial review. What is really at stake, however, is the landlord's ability to seek a stay of the Board's order pending judicial review. "Before there was an opportunity for the court to pass on whether to stay temporarily the Board's rent withholding order, tenant Plevka immediately withheld rent, and continued to do so for three months thereafter." (Maj. opn., *ante,* at p. 377.) Apparently, this makes the order unconstitutional in the view of the majority, though they never explain why this is so.

The majority's unspoken assumption is that a tenant who has withheld rent will be unwilling or unable to satisfy a judgment ordering the repayment of the withheld rent. Since the landlord may be faced with a judgment-proof opponent, they conclude that the landlord has not had adequate judicial review. They provide no authority for this view. The fact that one may not be able to collect on a judgment does not mean that one has not had access to the courts. Many litigants take this risk; it is not a risk with constitutional significance.

The narrow holding of this case is only that the Board's order was unconstitutional because it did not allow the landlord sufficient time to seek

a stay. As a factual matter, the only reason that the order here became "self-executing" and the tenant withheld rent before the court had an opportunity to decide whether to stay the order was that the landlord waited three months before requesting a stay. The Board issued its order in March, authorizing rent withholding for April, May and June. Starting in April the tenant withheld rent. Since the order was effective immediately, the landlord could have petitioned for judicial relief immediately, and sought a stay, before the withholding started in April. Instead, the landlord waited until late June to seek judicial relief and a stay.

The majority explain that the Board can avoid the constitutional problem by regularly staying enforcement of its orders for a period of time sufficient to allow an aggrieved party to seek a stay from the superior court. (Maj. opn., *ante,* at p. 377, fn. 44.) As the facts of the present case demonstrate, such a stay would normally be unnecessary. Since a Board order authorizing withholding of rent authorizes a future act, it may be effective immediately in the sense that the aggrieved party can immediately seek review of the order, but it is not enforceable in the sense that the tenant can immediately do anything unless the order is filed the day the rent is due. Furthermore, even a stay which is sought after the effective date of an order may undo the order and require remedial action pending judicial review. (See Cal. Administrative Mandamus (Cont.Ed.Bar 1966) § 10.8, p. 178.) Thus the status quo ante may be preserved even if the stay is sought and granted after the order became effective. For example, in this very case, once the landlord did request a stay, the court granted one, adding an order to the tenant to pay the withheld rent, retroactive to April 1, into a trust account held by the landlord's attorney, until the matter had been finally adjudicated in court. The landlord then had unimpaired judicial review and no practical obstacle to enforcing a judgment in his favor.

The majority say that this decision applies only to these facts, and has no effect on other administrative orders having immediate effect, "including immediately effective restitutive orders issued by professional licensing boards." (Maj. opn., *ante,* at p. 377, fn. 44.) Yet they provide no basis for distinguishing this case from others in which an immediately effective order is available.

It is established that an agency has the authority to make its orders effective immediately. (*Hohreiter* v. *Garrison* (1947) 81 Cal.App.2d 384, 402-403 [184 P.2d 323]; Cal. Administrative Hearing Practice (Cont.Ed.Bar 1984) § 4.45, p. 246.) The Administrative Procedure Act provides for the many agencies operating under its terms that an agency decision is effective 30 days after it is delivered unless the agency orders that the decision become effective sooner. (Gov. Code, § 11519, subd. (a).) It is obvious that in the case of professional licensing, an immediately effective order may

often be necessary. An incompetent physician or unsafe hospital should not provide services pending judicial review of a suspension or revocation order. In the area of pollution control, it is equally obvious that cease and desist and abatement orders must frequently be effective immediately. Thus, for example, a regional water quality control board may issue a cease and desist order against a party discharging or threatening to discharge prohibited waste. The order is effective immediately and may require immediate compliance. (Wat. Code, § 13303; see Collins, Complete Guide to Hazardous Materials Enforcement and Liability (1985) § 10-6.) Such a board's cleanup and abatement orders are also effective immediately. (Wat. Code, § 13304.) Similarly, a commissioner of the Department of Food and Agriculture may issue a cease and desist order for improper handling or sale of pesticides, which is effective immediately. (Food & Agr. Code, § 11897.) While these orders are not executed by a third party, as in the rent control situation, they may cause far greater economic losses before judicial review or a stay is available.

Although the majority have no desire to do so, their opinion casts into doubt whether administrative agencies may ever order any act to be done before judicial review or a stay is available. For the purpose of effective judicial review, there is no distinction between an immediately effective order suspending or revoking a license or requiring a licensee to reimburse a sum of money, an order requiring a polluter to cease and desist, and an order authorizing the withholding of rent. I fear that this opinion unwittingly will call into question the legitimacy of administrative action which is widespread and necessary for the protection of the public.

The petition of respondent McHugh for a rehearing was denied November 1, 1989.